DENNIS E. CLISHAM *v.* BOARD OF POLICE COMMISSIONERS OF THE BOROUGH OF NAUGATUCK ET AL.
(14412)

PETERS, C. J., CALLAHAN, GLASS, BORDEN and BERDON, Js.

Argued June 4—decision released August 4, 1992

*William F. Dow III,* with whom was *Steven D. Ecker,* for the appellant (plaintiff).

*William J. St. John, Jr.,* for the appellees (defendants).

PETERS, C. J. The dispositive issue in this appeal is whether the named defendant, the board of police commissioners of the borough of Naugatuck (board), acted with the impartiality mandated by the constitutional guarantees of due process when it voted to remove the plaintiff, Dennis E. Clisham, from the office of chief of police of the borough of Naugatuck.[1] During the course of removal proceedings commenced by the board pursuant to 26 Spec. Acts 934, No. 321, § 4,[2] the plaintiff filed a motion to disqualify in which he alleged that three members of the five member board were biased against him. The three members did not recuse themselves. After the five board members voted unanimously to remove the plaintiff from the office of chief of police and to terminate his employment with the police department, the plaintiff filed an appeal with the Superior Court pursuant to 26 Spec. Acts 934, No. 321, § 5.[3] The Superior Court dismissed the plaintiff's

---

[1] Also named as defendants were the following six individuals who were on the board during the removal proceedings: John J. Prior, Edward J. Mason, Jr., Maruta Jancis, Rocco J. DeCarlo, Terry L. Buckmiller and Robert Sharon.

[2] Number 321, § 4, of 26 Spec. Acts 934, provides: "Upon reasonable notice and after due hearing, the board of police commissioners may remove from office, for malfeasance or for any neglect or refusal to properly perform his duties, any member or officer of said department of police protection, including the chief of police. Such removal shall require an affirmative vote of all five members of the board of police commissioners."

[3] Number 321, § 5, of 26 Spec. Acts 934, provides: "Any person in the department of police protection, including the chief of police, removed from

appeal. The plaintiff appealed the judgment of dismissal to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We reverse.

The following facts underlie this appeal. The plaintiff, having been a lieutenant in the Naugatuck police department, became chief of police of the borough of Naugatuck as a result of the action of the board on July 26, 1984.[4] William Rado, then the mayor of Naugatuck and a member of the board, seconded the board's appointment of the plaintiff to this office. In May, 1985, Terry L. Buckmiller, a political rival of Rado, was elected mayor.

On December 9, 1987, the board, comprised of six individuals who had not been on the board at the time of the plaintiff's appointment, notified the plaintiff in writing that, following an investigation conducted by one of the attorneys for the borough, the plaintiff was being charged with eleven violations of the rules and regulations of the police department. Charges one, two and three alleged that in a Naugatuck bar on October 6,

office as provided in section 4 of this act, may appeal from the action of said board of police commissioners, within thirty days from the date of notice of such action, to the court of common pleas for the judicial district of Waterbury at Waterbury. Said court of common pleas may approve, modify or revoke the action of said board and may tax costs in its discretion. The action of the board shall remain in effect pending such an appeal, but, if said court shall modify or revoke the action of said board, its decree may relate back to the date of the action of said board."

[4] Number 321, § 3, of 26 Spec. Acts 934, provides in relevant part: "The board of police commissioners shall administer, maintain and control the department of police protection of the town and borough, and shall appoint all policemen, both members and officers including the chief of police . . . . The board shall set up all regulations pertaining to the police department, including standards governing the conduct and discipline of the members, officers and chief of police, standards governing the selection of members to the police department, and standards governing the promotions of members and officers in the police department, said standards of selection and promotion to include written examinations."

1987, the plaintiff had threatened the lives of two individuals and had "solicit[ed] a physical assault" upon another in violation of rule 17, § 1 (7), (10) and/or (11) of the rules and regulations of the Naugatuck police department.[5] Charges four and five alleged that, in a cafe on October 24, 1984, the plaintiff had assaulted an individual, had threatened his life and had threatened the lives of the individual's family members in violation of rule 17, § 1 (7), (10) and/or (11) of the rules and regulations of the Naugatuck police department. The sixth charge alleged that the plaintiff had assaulted individuals on three separate occasions and, thus, had "demonstrat[ed] a propensity for physical assaults upon persons" in violation of rule 17, § 1 (7), (10) and/or (11).[6]

The board commenced a series of hearings on the charges against the plaintiff on December 15, 1987. The stated purpose of the hearings was to decide whether the board would remove the plaintiff as chief of police. At the first hearing, the plaintiff made an oral motion that, "in the interest of fairness," board member Buckmiller recuse himself from sitting on the hearings. Buckmiller complied. The parties thereafter agreed that, pursuant to 26 Spec. Acts 934, No. 321, § 4,[7] in order to remove the plaintiff from office and terminate his employment with the police department, the remaining five members of the board would have to vote unanimously for his removal.[8]

---

[5] Rule 17, § 1 of the rules and regulations of the police department of the borough of Naugatuck provides that a police officer may be removed or suspended for "(7) immoral conduct . . . (10) Conduct unbecoming a member of the Police Force[; and] (11) Conduct injurious to the public peace and welfare."

[6] Charges seven through eleven each alleged separate incidents of misconduct that were subsequently dismissed by the board at the August 23, 1988 hearing and are therefore irrelevant to this appeal.

[7] See footnote 2, supra.

[8] The special act adopted in 1953 and amended in 1955 provided that the mayor was to be a nonvoting member of the board of police commissioners. Number 321, § 4, of 26 Spec. Acts 934, required an affirmative vote of all

At the January 26, 1988 hearing, the attorney for the borough began presenting evidence on the charges against the plaintiff. At that hearing, the plaintiff made an oral motion that another board member, Rocco DeCarlo, Sr., recuse himself because DeCarlo was then a defendant in a civil action the plaintiff had brought in the United States District Court. Following an executive session to discuss the motion, the board responded that DeCarlo would recuse himself if the plaintiff would allow the remaining four board members to preside and would accept as final the actions of those four board members. The plaintiff declined the board's offer and reminded it that the town charter provides that the chief of police can be removed only upon the unanimous vote of five board members. The hearings resumed and DeCarlo remained on the panel.

At the August 30, 1988 hearing, the plaintiff filed a motion to disqualify board members DeCarlo, Edward Mason and Robert Sharon. The motion alleged that DeCarlo had "expressed on prior occasions an animosity toward the movant and a conviction that the movant should be removed from office"; that Mason had "publicly and repeatedly expressed and maintained a belief that the movant should be removed from office and ha[d] actively taken steps to assure that that should occur"; and that Sharon had testified as a witness against the plaintiff before a grand jury. The plaintiff offered to present evidence to support his claims of bias as to each of the three board members named and attempted to call each as a witness. The board sustained an objection to calling the board members as witnesses, but did hear the testimony of two other witnesses.

five *voting* members of the board. In 1969, the legislature enacted 34 Spec. Acts 33, No. 30, § 1, which authorizes the mayor to vote on any matter before the board. Thus, there are now six voting members on the board. Following Buckmiller's recusal, a unanimous vote of five remaining board members was required in order to remove the plaintiff from office, pursuant to 26 Spec. Acts 934, No. 321, § 4.

Although the record does not reflect that the board ever made an affirmative ruling to deny the plaintiff's motion to disqualify DeCarlo, Mason and Sharon, the hearings continued with their presence.

At the February 14, 1989 hearing, the board voted on each of the six remaining charges. By a four to one margin, the board voted that charges one and three had been proved. The board voted by a three to two margin that the second charge had been proved. It unanimously concluded that charges four and five had not been proved and that charge six had been proved. At the conclusion of the hearing, the board voted unanimously to grant a motion to dismiss the plaintiff from the Naugatuck police department for violating departmental rules and regulations. The board served a written notice of its decision on February 21, 1989.

The plaintiff appealed to the Superior Court within thirty days, as required by 26 Spec. Acts 934, No. 321, § 5, claiming that (1) he was denied a hearing by an impartial panel in violation of his due process rights,[9] (2) the board improperly based its decision to dismiss the plaintiff on facts known at the time of his appointment, and (3) the board's decision to remove the plaintiff violated the unanimity requirement of 26 Spec. Acts 934, No. 321, § 4. The trial court ruled against each of the plaintiff's claims and, accordingly, rendered a judgment dismissing his appeal.

On appeal to this court, the plaintiff reasserts the three claims he raised below.[10] Because we are persuaded that the participation of Mason in the board's decision to dismiss the plaintiff denied the plaintiff his

---

[9] At oral argument before the trial court, the plaintiff withdrew his claim that Sharon had been biased.

[10] The plaintiff also claims for the first time that the board acted improperly in finding a "propensity" for assaultive conduct on the basis of a single incident. We do not review this claim as the plaintiff did not raise it in his appeal to the trial court.

constitutional right to be heard by an impartial tribunal, we reverse the trial court's judgment and direct a remand to the board for a new hearing before an impartial panel.[11]

I

Number 321, § 4, of 26 Spec. Acts 934, provides in relevant part that "[u]pon reasonable notice and after due hearing, the board of police commissioners may remove from office, for malfeasance or for any neglect or refusal to properly perform his duties, any member or officer of said department of police protection, including the chief of police."[12] Because a police chief in Naugatuck can be removed from office only for "malfeasance or for any neglect or refusal to properly perform his duties," the plaintiff has a property interest in his position as chief of police that is protected by the due process clause of the fourteenth amendment to the United States constitution; see *Cleveland Board of Education* v. *Loudermill,* 470 U.S. 532, 538–39, 105 S. Ct.

---

[11] In these circumstances, we need not determine whether the board should have granted the plaintiff's motion to disqualify DeCarlo. We also need not decide whether, in voting to remove the plaintiff from the office of chief of police, the board improperly considered facts that were known to it at the time the plaintiff was appointed to that office. Finally, we need not decide whether the board's votes on the underlying charges violated the unanimity requirement of 26 Spec. Acts 934, No. 321, § 4.

[12] General Statutes § 7-278 provides in relevant part that "[n]o active head of any police department of any town, city or borough shall be dismissed unless there is a showing of just cause by the authority having the power of dismissal . . . ." This statewide "just cause" requirement was enacted in 1983. See Public Acts 1983, No. 83-212. "A special and local statute, providing for a particular case or class of cases, is not affected by a statute general in its terms, broad enough to include cases embraced in the special law, unless the intent to repeal or alter is manifest." *State ex rel. Wallen* v. *Hatch,* 82 Conn. 122, 124–25, 72 A. 575 (1909). Because, in enacting § 7-278, the legislature has not shown a manifest intent to repeal 26 Spec. Acts 934, No. 321, § 4, to the extent that the provisions of the special act and the general statute are inconsistent, the special act is controlling. Id., 125. Consequently, the "malfeasance" standard of the special act governs this case.

1487, 84 L. Ed. 2d 494 (1985); *Bartlett* v. *Krause,* 209 Conn. 352, 366–67, 551 A.2d 710 (1988); *Lee* v. *Board of Education,* 181 Conn. 69, 71–73, 434 A.2d 333 (1980); and by article first, § 8 of the Connecticut constitution. See *Lee* v. *Board of Education,* supra, 71–72 ("[a]rticle one, section eight of our state constitution . . . given the same effect as the fourteenth amendment to the federal constitution"); see also *Rado* v. *Board of Education,* 216 Conn. 541, 555, 583 A.2d 102 (1990); *Petrowski* v. *Norwich Free Academy,* 199 Conn. 231, 234, 506 A.2d 139, appeal dismissed, 479 U.S. 802, 107 S. Ct. 42, 93 L. Ed. 2d 5 (1986).

In our analysis of the plaintiff's claim that his due process rights were violated, we must balance "the governmental interest in existing procedures against the risk of erroneous deprivation of a private interest through the use of these procedures." *Petrowski* v. *Norwich Free Academy,* supra, 235. That analysis starts from the proposition that the board was acting in a quasi-judicial capacity when it undertook dismissal proceedings against the plaintiff. See id., 234; *Catino* v. *Board of Education,* 174 Conn. 414, 417, 389 A.2d 754 (1978). "At the core of due process is the requirement for an impartial tribunal. See *Tumey* v. *Ohio,* 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927). Due process demands . . . the existence of impartiality on the part of those who function in judicial or quasi-judicial capacities." (Internal quotation marks omitted.) *Rado* v. *Board of Education,* supra, 556; see also *Schweiker* v. *McClure,* 456 U.S. 188, 195, 102 S. Ct. 1665, 72 L. Ed. 2d 1 (1982).

"The applicable due process standards for disqualification of administrative adjudicators do not rise to the heights of those prescribed for judicial disqualification." *Petrowski* v. *Norwich Free Academy,* supra, 238; see *Jutkowitz* v. *Department of Health Services,* 220 Conn. 86, 100, 596 A.2d 374 (1991). "The mere appearance

of bias that might disqualify a judge will not disqualify an arbitrator." (Internal quotation marks omitted.) *Rado* v. *Board of Education,* supra, 556. Moreover, there is a presumption that administrative board members acting in an adjudicative capacity are not biased. *Jutkowitz* v. *Department of Health Services,* supra; *Rado* v. *Board of Education,* supra. "To overcome the presumption, the plaintiff . . . must demonstrate actual bias, rather than mere potential bias, of the board members challenged, unless the circumstances indicate a probability of such bias 'too high to be constitutionally tolerable.' " *Rado* v. *Board of Education,* supra, quoting *Withrow* v. *Larkin,* 421 U.S. 35, 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975). The plaintiff has the burden of establishing a disqualifying interest. *Jutkowitz* v. *Department of Health Services,* supra; *Petrowski* v. *Norwich Free Academy,* supra, 236.

In order to prove bias as a ground for disqualification, the plaintiff must show more than an adjudicator's "announced previous position about law or policy . . . ." 3 K. Davis, Administrative Law (2d Ed. 1980) § 19.2, p. 372; see also *Hortonville Joint School District No. 1* v. *Hortonville Education Assn.,* 426 U.S. 482, 493, 96 S. Ct. 2308, 49 L. Ed. 2d 1 (1976). He must make a showing that the adjudicator has prejudged adjudicative facts that are in dispute. 3 K. Davis, supra, § 19.4, p. 382. "A tribunal is not impartial if it is biased with respect to the factual issues to be decided at the hearing." *Miller* v. *Mission,* 705 F.2d 368, 372 (10th Cir. 1983). "The test for disqualification has been succinctly stated as being whether 'a disinterested observer may conclude that [the board] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.' *Gilligan, Will & Co.* v. *SEC,* 267 F.2d 461, 469 (2d Cir.), cert. denied, 361 U.S. 896, 80 S. Ct. 200, 4 L. Ed. 2d 152 (1959)." *Cinderella Career & Finishing Schools, Inc.* v. *Federal*

*Trade Commission,* 425 F.2d 583, 591 (D.C. Cir. 1970); see also *Charlottesville* v. *Federal Energy Regulatory Commission,* 774 F.2d 1205, 1212 (D.C. Cir. 1985), cert. denied, 475 U.S. 1108, 106 S. Ct. 1515, 89 L. Ed. 2d 914 (1986).

## II

To support his motion to disqualify Mason, the plaintiff, at the August 30, 1988 hearing, offered the testimony of Carl Miele, then Naugatuck's Democratic Town Chairman and formerly a political advisor to Buckmiller during his 1985 and 1987 mayoral campaigns. Miele testified that Buckmiller's "first and foremost campaign pledges" had been to "get rid of Chief Dennis Clisham" and that Buckmiller had made public statements to that effect. He testified that, prior to Mason's appointment to the board, he and Mason had been members of a "small group of close advisors" to Buckmiller, to which he referred as an "inner circle." He testified that this group, consisting of five members, had met regularly over an eighteen month period following Buckmiller's election to the office of mayor in May, 1985. Miele responded affirmatively when asked whether, both before and after Buckmiller's election as mayor, Mason had expressed "support for the proposition that Mr. Clisham shouldn't be police chief."

Miele also testified concerning Mason's efforts to amend the unanimity requirement of 26 Spec. Acts 934, No. 321, § 4. Miele told the board that, prior to Mason's appointment to the board, Mason's "main objective [had been] the police regulations." The new regulations "were to include that the police chief would be dismissed by a majority instead of a unanimous vote." He testified that the purpose of the effort to change the unanimity requirement had been "to dump Clisham."

The plaintiff asked Miele at the hearing whether it had been brought to his attention through the meetings of the "inner circle," that "there was to be a meeting concerning Chief Clisham with certain members of the Board of Police Commissioners." Miele replied that he had heard in advance that this meeting was to be held and further testified that "[i]t was a meeting where the Borough attorney attended, Mr. Mason attended, a quorum attended, the Mayor attended, and was an illegal meeting where a quorum was present." He stated that "[t]hey were going to meet and discuss Chief Clisham."

The plaintiff also submitted evidence to the board of a statement that Mason had made to a reporter during the pendency of the removal proceedings. The August, 1988 edition of Connecticut Magazine contained an article focusing on the politics of Naugatuck that, as the trial court observed, "can reasonably be described as favorable to Buckmiller and contains some unfavorable statements by Buckmiller regarding Clisham." The article chronicled Rado's tenure as mayor, the transition to Buckmiller as mayor and the troubles that had plagued and continued to plague the plaintiff as chief of police. The article stated that "[f]rom the very beginning, Buckmiller made no secret of the fact that if he had the power, he would fire Clisham immediately." The plaintiff offered into evidence a copy of the July 26, 1988 Waterbury Republican, which contained the following quote attributed to Mason: " 'Being a supporter of Buckmiller, I thought [the Connecticut Magazine article] was great. . . . I thought it was devastat[ing] for Clisham, Rado and company. Whoever wrote it, he's a friend of mine. Of course, if you're a Rado supporter, you're not going to like it.' " At the September 20, 1988 hearing, the plaintiff offered the testimony of Terry Corcoran, the reporter who wrote the July 26, 1988 article. Corco-

ran testified that Mason had made the statement that appeared in the July 26 article. He stated that he had chosen to interview Mason because he had been aware that Mason was "in the inner circle with Buckmiller." Corcoran also testified that Mason's reference to Clisham was spontaneous and had not been elicited by Corcoran, i.e., that it had not come in response to a question about Clisham.

In 1991, the plaintiff deposed Buckmiller, and introduced in the trial court the transcript of the deposition as additional evidence of Mason's bias.[13] Buckmiller stated that, even before he had announced his candidacy, he had believed and had openly stated that the plaintiff should not have been appointed as chief of police. Buckmiller agreed that the plaintiff's management of the police department was an issue during his first mayoral campaign. He stated that he and Mason, who had been one of his political supporters, had become "good friends" in January of 1985. Buckmiller stated that Mason had acted as an advisor during his mayoral campaign. He acknowledged that during his mayoral campaign, he had spoken frequently with Mason, approximately once per day. Buckmiller continued to consult frequently with Mason after the election. Buckmiller admitted that in November, 1985, he had publicly stated that the plaintiff should be removed as chief of police.

---

[13] General Statutes § 7-278 provides that, in deciding an appeal brought by the head of a police department who has been dismissed, the trial court "shall review the record of such hearing, and, if it appears upon the hearing upon the appeal that testimony is necessary for an equitable disposition of the appeal, it may take evidence or appoint a referee or a committee to take such evidence as it directs and report the same to the court with his or its findings of fact, which report shall constitute a part of the proceedings upon which the determination of the court shall be made. . . ." To the extent that this provision of § 7-278 is not inconsistent with 26 Spec. Acts 934, No. 321, § 5; see footnote 3, supra; we conclude that it applied to the instant appeal. Although the trial court in the present case did not hear any additional testimony, it did admit Buckmiller's deposition as evidence.

Buckmiller confirmed Miele's testimony regarding the effort to amend the regulations to require less than a unanimous vote to remove the chief of police. This amendment was deemed necessary because two of Rado's appointees remained on the board and, consequently, there were not sufficient votes on the board to remove the plaintiff from the office of chief of police. Buckmiller assigned to Mason the task of amending the regulations to require less than a unanimous vote for removal. The effort was, however, ultimately abandoned.

Buckmiller acknowledged that he had had a "mission" to clean up the town of Naugatuck and that Mason had become an ally in this mission. Although Buckmiller stated that Mason had "always told me he liked Ned Clisham," and that he did not remember Mason saying that "we should get rid of Ned Clisham," Buckmiller responded affirmatively when asked: "And whether Ted Mason liked or didn't like Ned Clisham or whether you did or didn't like Ned Clisham, the police chief, Ned Clisham, was a problem; isn't that correct?"

Buckmiller also confirmed Miele's testimony concerning the November, 1986 illegal meeting attended by Mason and four members of the board, including Buckmiller. The two board members who were holdovers from the Rado administration were not present at that meeting. Buckmiller acknowledged that those in attendance at the illegal meeting had agreed that the office of the chief of police was not being "fulfilled properly" and that the plaintiff should be replaced.

On October 6, 1987, Buckmiller appointed Mason and Maruta Jancis to fill two vacancies on the board. Buckmiller indicated in his deposition that he would have appointed only someone who shared his feelings about cleaning up the town and that he had known that Mason

shared his views about the police department and the position of police chief. The board notified the plaintiff of the charges against him just over two months after Mason's appointment to the board.

## III

The board contends that, for three reasons, this factual showing is insufficient as a matter of law to demonstrate Mason's prejudgment of the plaintiff's alleged misconduct. The board asserts that: (1) the plaintiff failed to assert his claim of Mason's bias in a timely manner; (2) the evidence adduced by the plaintiff failed to demonstrate that Mason had prejudged any issue that was before the board; and (3) even if Mason should have been disqualified, the doctrine of necessity requires this court to uphold the board's decision to remove the plaintiff. We are unpersuaded.

## A

A claim of bias must be raised in a timely manner. "The failure to raise a claim of disqualification with reasonable promptness after learning the ground for such a claim ordinarily constitutes a waiver thereof." *Henderson* v. *Department of Motor Vehicles*, 202 Conn. 453, 462, 521 A.2d 1040 (1987). One court has noted that "a challenge to a judge for bias and prejudice must be made at the first opportunity after discovery of the facts tending to prove disqualification. . . . To hold otherwise would be to allow a litigant to pervert and abuse the right extended to him at the cost to the other party of unnecessary expense and labor and to the public of the unnecessary disruption of the conduct of the courts." (Citation omitted.) *Chafin* v. *United States*, 5 F.2d 592, 595 (4th Cir.), cert. denied, 269 U.S. 552, 46 S. Ct. 18, 70 L. Ed. 407 (1925); see *Duffield* v. *Charleston Area Medical Center, Inc.*, 503 F.2d 512, 515 (4th Cir. 1974) ("claim of disqualifying bias or partiality on the part of a member of . . . an administrative agency

must be asserted promptly after knowledge of the alleged disqualification"). Moreover, "we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during the [hearing]." (Internal quotation marks omitted.) *Henderson* v. *Department of Motor Vehicles,* supra.

In addressing the issue of timeliness, the trial court found that "it would be . . . quite surprising if Clisham had not known of the facts he alleges at the time of the campaign since Clisham was, or so he claims, a major issue in that campaign." Consequently, it declined to consider any claims of bias other than the claim stemming from Mason's statement to Corcoran of the Waterbury Republican, which, the trial court stated, had been raised in a timely manner.

We conclude that the plaintiff timely asserted his claim that Mason was impermissibly biased and that all relevant evidence was admissible to substantiate that claim. First, although the plaintiff was undoubtedly aware of Buckmiller's desire to have him removed as chief of police, the record is devoid of evidence tending to show that the plaintiff knew, or should have known, the extent of Mason's behind the scenes participation in Buckmiller's campaign to remove the plaintiff from office, prior to obtaining that information from Miele.[14] Miele, who, as a former close advisor to Buckmiller and member of the "inner circle" with Mason,

---

[14] Although the board asserted in its brief to the trial court that "[w]ith regard to Mr. Mason all of the allegations of bias against him, with the exception of the comment concerning the aforementioned magazine article, were known to the appellant long before August 30, 1988," it provided no evidence to support this statement. Moreover, the trial court does not indicate how it reached its conclusion that "[w]ith respect to Mason's involvement in the May, 1985 campaign, it would be . . . quite surprising if Clisham had not known of the facts he alleges at the time of the campaign . . . ."

was instrumental in substantiating the plaintiff's claim that Mason was biased, apparently did not come forward until May or June, 1988, with the information he gave to the board at the August 30, 1988 meeting.[15] This record does not provide support for the trial court's contrary finding. The plaintiff raised the issue about Mason's bias at a hearing of the board soon after his discovery of the facts that would provide evidence to support such a claim.

Second, once the plaintiff raised his claim of bias following the publication of Mason's statement in the Waterbury Republican, a claim that the board concedes was timely, the prior evidence of bias was relevant to substantiate that claim. The plaintiff's claim was based upon evidence of bias that was cumulative in nature. We do not look at each piece of evidence in isolation and treat it as a separate and distinct claim of bias. Rather, to determine whether there was actual bias or a "probability of such bias too high to be constitutionally tolerable"; (internal quotation marks omitted) *Rado* v. *Board of Education,* supra, 556; we look at the uncontroverted evidence of Mason's role as an advisor and consultant to Buckmiller both before and after the mayoral campaign, his participation in the illegal meeting of a quorum of board members, his attempt to amend the regulations to eliminate the unanimity requirement *and* his statement to Corcoran of the Waterbury Republican during the pendency of the removal hearings. The plaintiff cannot, therefore, be deemed to have waived his claim that Mason was impermissibly biased.

[15] Hearings were scheduled for May 24, 1988, July 12, 1988, August 23, 1988, and August 30, 1988. The July 12 and August 23 hearings were continued. Thus, if Miele came forward after May 24, the plaintiff's first opportunity to offer this evidence of bias to the board would have been at the August 30, 1988 hearing.

## B

We turn next to the board's contention that the plaintiff has failed to sustain his burden of proving that Mason had prejudged any issue that was before the board. In addressing the sufficiency of the evidence adduced by the plaintiff, we confront both a procedural and a substantive question. Procedurally, what is the appropriate standard of review of the determination of the trial court concluding that the evidence was insufficient? Substantively, what should our conclusion be?

As a procedural matter, a trial court adjudicating an administrative appeal that raises an issue of bias will often hold an evidentiary hearing at which testimony about the presence or absence of bias is presented by the interested parties. In such circumstances, "[b]ecause the existence of actual bias on the part of a board member present[s] an issue of fact on which the plaintiff [has] the burden of proof, the determination of the trial court that the evidence did not establish such bias cannot be overturned, unless the subordinate facts found or the admitted or undisputed facts would require a different conclusion as a matter of law." *Rado* v. *Board of Education,* supra, 561. In the present case, however, the trial court heard no testimony on the issue of bias, although it had the authority to do so under § 7-278.[16] The question, therefore, arises whether we should defer to the trial court's factual findings[17] that were derived from its review of the same administrative record that is presently before us. We conclude that such deferral is not warranted.

---

[16] See footnote 13, supra.

[17] The trial court stated that "[r]eviewing the record . . . the Court is unable to conclude that the record establishes a personal bias sufficiently great to require the result of the hearing to be set aside."

"[C]redibility of witnesses and the determination of factual issues are matters within the province of [the board]"; (internal quotation marks omitted) *Huck* v. *Inland Wetlands & Watercourses Agency,* 203 Conn. 525, 540–41, 525 A.2d 940 (1987); and, as noted above, the existence of bias is an issue of fact. Nevertheless, we hold that the uncontradicted evidence of Mason's bias was overwhelming and, therefore, conclude as a matter of law that Mason's participation in the hearings violated the plaintiff's due process right to an impartial panel. Miele's testimony before the board, which was confirmed in many respects through the deposition testimony of Buckmiller, and which has never been contradicted by the board, demonstrates a probability of bias " 'too high to be constitutionally tolerable.' " *Rado* v. *Board of Education,* supra, 556. A disinterested observer, viewing the undisputed evidence, would necessarily conclude that Mason had in some measure adjudged the facts of the plaintiff's case in advance of hearing it. *Cinderella Career & Finishing Schools, Inc.* v. *Federal Trade Commission,* supra, 591.

The present case is analogous, on its merits, to *Staton* v. *Mayes,* 552 F.2d 908 (10th Cir. 1977). The plaintiff in *Staton* was the superintendent of a school district in Oklahoma. The defendants were three members of a five member board that had caused the plaintiff's dismissal on charges of willful neglect of duty and incompetence. Id., 909–10. In that case, the plaintiff presented undisputed evidence that board member Mayes had made public statements in his campaign for election to the board concerning the plaintiff and that he had "pledged to seek a new top level administration for the schools . . . and [stated that] it had become apparent to him that the trouble lay with the superintendent, and that he would vote to make the necessary change." Id., 913. Board member Moore

"admitted going to visit with a board member . . . and saying there was a possibility [that the] plaintiff would be leaving and if they could 'be together on the board and not disrupt the board, where we could continue to have school for children, it would be best for all of us.' " Id., 914. Board member Wade admitted telling a board member that the plaintiff " 'has got to go.' " Id. The court, applying the test enunciated in *Cinderella Career & Finishing Schools, Inc.* v. *Federal Trade Commission,* supra, stated that, although each board member testified that he had based his decision to vote for dismissal solely upon the evidence presented at the hearings, there was sufficient evidence to conclude that the board was not impartial and, thus, that the plaintiff's due process rights had been violated. *Staton* v. *Mayes,* supra, 914–15.

We recognize that the statement made by Mayes in *Staton* that he would "vote to make the necessary change" was more direct evidence of the prejudgment of issues than any statement attributable to Mason. The description of the other two board members meeting with yet another board member and discussing the school superintendent, however, is very similar to Miele's testimony about Mason's private actions regarding the plaintiff. In the guise of cleaning up the police department, Mason and Buckmiller pursued possible ways to "dump" the plaintiff, including amending the regulations to require less than a unanimous vote for removal. They held a secret meeting, which was attended by Mason, who had not yet been appointed to the board, Buckmiller and only those members of the board who had been appointed by Buckmiller. At that meeting they discussed the plaintiff and his management of the police department. Moreover, it is highly relevant that Mason's statement to Corcoran, though perhaps less specific than the public statements made by the board member in *Staton* during his bid for

election to the board, was made at a time when Mason was a police commissioner and at a time when the removal hearings were ongoing and evidence was still being taken.

When Mason's statement in the Waterbury Republican is viewed against the backdrop of all of the other evidence of Mason's bias arising prior to the hearings, we are convinced that the plaintiff has successfully demonstrated that Mason was not capable of judging fairly the ultimate issue of whether the plaintiff should have been dismissed from his position. See *Hortonville Joint School District No. 1* v. *Hortonville Education Assn.*, supra, 493. The totality of the evidence did not demonstrate a mere stance on general policy issues; see id., 492–93; nor is this a case where statements were made during the investigation of charges against the plaintiff. See *Withrow* v. *Larkin*, supra, 52–55. Rather, the evidence overwhelmingly demonstrated a high probability of bias in favor of removing the plaintiff as chief of police that existed both before and during the hearings.

The board attempts to rebut the inference that Mason was impermissibly biased by focusing upon Mason's votes on the underlying charges. It emphasizes that Mason voted against a finding that five of the six charges against the plaintiff had been proved. Mason, however, voted unanimously with the remaining four members of the board on the most important factual issue of the entire hearings, i.e., whether to remove the plaintiff as chief of police. The fact that Mason voted in favor of the plaintiff on five charges that did not require a unanimous vote does not negate in any way the substantial evidence tending to show that Mason had prejudged the removal issue.

We conclude, therefore, that Mason's participation in the hearings deprived the hearings "of that fairness

and impartiality necessary to that fundamental fairness required by due process." *National Labor Relations Board* v. *Webb Ford, Inc.*, 689 F.2d 733, 737 (7th Cir. 1982). The plaintiff cannot be ousted from his office on the basis of so tainted a hearing.

## C

The board claims, finally, that, even if the record supports a conclusion that Mason was not an impartial adjudicator, "the administrative rule of necessity mandates that the board's decision to terminate Chief Clisham must stand." Number 321, § 2, of 26 Spec. Acts 934, provides that the board of police commissioners of the borough of Naugatuck shall consist of the mayor and five other members appointed by the mayor. Section 4 of the same act provides that the chief of police may be removed from office only upon "an affirmative vote of five members of the board of police commissioners."[18] No other tribunal has been given the authority to remove the chief of police, nor is there a procedure for replacing a board member who is disqualified from hearing an isolated case. The board asserts that, because there is no provision for replacing a disqualified board member, we must resort to the doctrine of necessity to uphold the board's decision to remove the plaintiff. We do not agree.

We have recognized that the doctrine of necessity may operate to permit participation in adjudicative proceedings by someone who would otherwise be disqualified. " 'Disqualification must yield to necessity where to disqualify would destroy the only tribunal in which relief could be had and thus preclude determination of the issue. In such case it has been held, consistently, the court must act no matter how disagreeable its task may be.' " *Dacey* v. *Connecticut Bar Assn.*, 170 Conn.

---

[18] See footnote 8, supra.

520, 524, 368 A.2d 125 (1976). The doctrine of necessity applies to administrative tribunals as well as to courts. 3 K. Davis, supra, § 19.9, pp. 404–405.

We are unpersuaded that the doctrine of necessity validates the plaintiff's ouster in the circumstances of this case. We conclude, to the contrary, that the plaintiff's constitutional right to a fair hearing before an impartial tribunal must be preserved by a remand for a new administrative hearing. The board does not contest the seriousness of the plaintiff's property interest in retention of his position as chief of police. It would be a miscarriage of justice to uphold the board's actions in this instance merely because the town has not provided a procedure for replacing disqualified board members. There can be no public confidence in a decision rendered by a board whose members include one demonstrating not merely an associational relationship to one of the parties, as in *Dacey* v. *Connecticut Bar Assn.,* supra, but prejudgment of the very issue that the board was authorized to determine.

We need not determine what alternatives the board might have pursued in order to proceed after Mason's disqualification. Some courts have suggested that board members who have disqualifying interests could remedy the situation by resigning. See, e.g., *State ex rel. Miller* v. *Aldridge,* 212 Ala. 660, 664, 103 So. 835 (1925); *Stahl* v. *Board of Supervisors,* 187 Iowa 1342, 1353, 175 N.W. 772 (1920).[19] Because Mason is no longer a member of the board,[20] we presume that on remand the board will be so constituted as to conduct an impartial hearing.

---

[19] Number 520, § 1, of 27 Spec. Acts 433, provides that "[i]n the event of a vacancy in said board for any reason, including . . . resignation . . . the [mayor] shall, within thirty days of such vacancy, appoint an elector of said borough to serve for the remainder of the unexpired term."

[20] Mason and DeCarlo are both deceased.

The judgment is reversed, and the case is remanded to the trial court with direction to remand the case to the board of police commissioners for a new hearing.

In this opinion the other justices concurred.