******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

VILLAGES, LLC v. ENFIELD PLANNING AND
ZONING COMMISSION
(AC 35357)
(AC 35358)

DiPentima, C. J., and Lavine and Dupont, Js.

*Argued February 4—officially released April 15, 2014*

(Appeal from Superior Court, judicial district of
Hartford, Hon. Richard M. Rittenband, judge trial
referee.)

*Kevin M. Deneen*, town attorney, with whom was
*Maria Elsden*, senior assistant town attorney, for the
appellant (defendant).

*Gwendolyn S. Bishop*, for the appellee (plaintiff).

*Opinion*

LAVINE, J. The defendant, Enfield Planning and Zoning Commission (commission), appeals from the judgments of the trial court sustaining the appeals of the plaintiff, Villages, LLC. In both appeals, the commission claims that the court improperly sustained the plaintiff's appeals on the basis of bias and an ex parte communication on the part of a member of the commission.[1] We affirm the judgments of the trial court.

The record discloses the following facts and procedural history. On or about May 21, 2009, the plaintiff filed an application for a special use permit and an application for an open space subdivision consisting of thirty-eight residential housing lots situated on sixty-four acres of land in an R-44 residential district in Enfield. In Enfield, an open space subdivision in an R-44 district is permitted only by special use permit. The commission held a public hearing on both of the plaintiff's applications on July 9, 2009, July 23, 2009, September 3, 2009, and October 1, 2009. The commission closed the public hearing on October 1, 2009. On October 15, 2009, the commission met to deliberate and vote on the plaintiff's applications. The commission denied both applications.

The plaintiff appealed from the denials to the trial court. In its appeals, the plaintiff alleged, among other things, that each of its applications met all of the police, fire, health, safety, open space, and utility requirements. In addition, the plaintiff alleged that the commission illegally and arbitrarily predetermined the outcome of each of its applications prior to the public hearing and was motivated by improper notions of bias and personal animus when it denied each of the applications. The appeals were consolidated for trial, and the court issued its ruling in a single memorandum of decision.

The court found that the plaintiff was the owner of the property and that it was statutorily aggrieved by the commission's decisions. The court also found that the plaintiff's allegations of bias and ex parte communication arose from the actions of Lori Longhi, a member of the commission. More specifically, the court found that Longhi took part in the hearing on the plaintiff's applications, played a significant role in the deliberations, and voted to deny the plaintiff's applications. Longhi had been a social friend of one of the plaintiff's owners, Jeannette Tallarita, and her husband, Patrick Tallarita, a former mayor of Enfield. There was a falling out among the friends, and the court found that Longhi was biased against Patrick Tallarita,[2] who represented the plaintiff at the hearing before the commission. The court also found that Longhi engaged in an ex parte communication regarding the applications.

The court found two instances that gave rise to the plaintiff's claim of bias on Longhi's part. Prior to the

events at issue here, Longhi accused Tallarita of using his influence as mayor to affect the outcome of commission decisions.[3] Longhi's accusation led to the end of their social relationship. The plaintiff did not bring this matter to the attention of the commission prior to the public hearing, as Tallarita did not want to anger members of the commission. The court understood the plaintiff's rationale but concluded that the plaintiff's failure to bring the alleged bias to the attention of the commission precluded the court from considering it on appeal. In reaching its conclusion, the court relied on *Moraski* v. *Connecticut Board of Examiners of Embalmers & Funeral Directors*, 291 Conn. 242, 967 A.2d 1199 (2009). In *Moraski*, our Supreme Court declined to review the plaintiffs' claim that their rights to due process were impaired on account of bias held by the individual members of the examining board because the plaintiff failed to raise the claim prior to or during the hearing before the examining board. Id., 266. Because the plaintiff in the present case failed to raise Longhi's bias predicated on her falling out with Tallarita prior to or during the commission's hearing, the court found that the commission had no opportunity to rebut a claim of bias and held that the plaintiff could not raise the claim on appeal in the trial court.

The court, however, found that an incident in which Longhi stated that "she wanted [Tallarita] to suffer the same fate of denial by the commission that she had suffered" was a different matter. At trial, Anthony DiPace testified that Longhi had stated to him that the commission, when it previously considered an application that she had submitted, had "screwed her" and treated her unfairly when it denied that application. She was unhappy with Tallarita, who was then mayor, because he did not intervene on her behalf. She stated in the presence of DiPace that she wanted Tallarita to suffer the same fate, i.e., that the commission deny the plaintiff's applications. Tallarita did not become aware of Longhi's statement regarding the fate of the plaintiff's applications until after the commission had closed the public hearing. The court found that Longhi's comments were blatantly biased toward Tallarita and should not be tolerated. The court also found that it had not been possible for the plaintiff to bring Longhi's comments regarding Tallarita to the attention of the commission because he learned of them after the hearing had closed and the commission had denied the plaintiff's applications.

Credibility was a deciding factor in the court's decision regarding Longhi's ex parte communication. Tallarita, DiPace, and Bryon Meade testified during the trial. The court found that each of the men was a credible witness. Longhi also testified at trial, but the court found that her testimony was filled with denials of the allegations and concluded that her "comments did not ring true." The court found that Meade, a representative of

the Hazardville Water Authority, testified with confidence that Longhi had met with him in person regarding the plaintiff's applications during the first week of October, 2009. Longhi testified, however, that Meade must have been confused because she met with him regarding another property. The court stated that Longhi's testimony was just not credible.

In addressing the plaintiff's claim that Longhi improperly engaged in ex parte communications with Meade, the court noted that "[o]ur law clearly prohibits the use of information by a municipal agency that has been supplied to it by *a party* to a contested hearing on an ex parte basis." (Emphasis in original.) *Norooz* v. *Inland Wetlands Agency*, 26 Conn. App. 564, 569, 602 A.2d 613 (1992). The court found that it was "clear" that Longhi had an ex parte communication with Meade. Once the plaintiff had proven that the ex parte communication had occurred, the burden shifted to the commission to demonstrate that such communication was harmless. See *Daniel* v. *Zoning Commission*, 35 Conn. App. 594, 597–98, 645 A.2d 1022 (1994). The court found that the commission had not met its burden to prove that Longhi's ex parte communication was harmless.

In adjudicating the plaintiff's appeals, the court reviewed the transcript of the commission's October 15, 2009 meeting when it considered the plaintiff's applications. It found that the transcript was twenty-three pages long and that Longhi's comments appeared on every page but one, and that on most pages, Longhi's comments were the most lengthy. Her comments raised many negative questions about the plaintiff's applications. Moreover, in offering her comments, she cited her experience as an appraiser.[4] The court found that Longhi dominated the meeting and that she intended to have a major effect on the commission's deliberations and subsequent votes. The court found clear and egregious bias on Longhi's part, and that her impact on the commission's deliberations and votes alone were reason to sustain the plaintiff's appeal.

Longhi's ex parte communication related to the issue of whether there was sufficient water pressure to furnish the fire department with enough water to extinguish a fire at the subdivision. After reviewing the transcript of the October 15, 2012 hearing, the court found that Longhi's arguments regarding the fire flows and water pressure were "intense" and were matters that she had discussed with Meade. The court also found that she expressed her concerns in a negative manner. In addition, it found that the commission's discussion concerning fire flow and water pressure was substantial and that those issues were the reason that the plaintiff's applications were denied.

The court noted the commission's argument in its posttrial brief that "the sole issue of a technically complex nature was 'fire flows.' Because this issue was left

unresolved after the close of the public hearing, it was proper for the [commission] to deny the application." The court found that that statement overlooked the strong opinions Longhi voiced during the commission's deliberations on October 15, 2009. The court also was not persuaded that the same information was contained in a report from the fire chief, as the commission had argued. The court found that Longhi's negative comments on the matters related to water pressure and fire flow were an integral part of the commission's decisions. Moreover, Longhi never disclosed to the other members of the commission that she had obtained ex parte information from Meade after the public hearing had closed. The court concluded that Longhi's actions were improper, prejudicial, and unfair to the plaintiff.

In conclusion, the court stated that, on the basis of the bias Longhi demonstrated against the plaintiff and her ex parte communication with Meade, along with her biased, aggressive, and vociferous arguments against the applications on October 15, 2009, the commission's action was not honest, legal, and fair. The court therefore sustained the plaintiff's appeals and remanded the matter to the commission for further public hearings, including any amendments or additional evidence that the plaintiff may wish to present.[5]

Thereafter, the commission filed petitions for certification to appeal from the judgments of the trial court. This court granted the petitions for certification and consolidated the appeals. On appeal, the commission claims that the court improperly (1) predicated its decision, in part, on a claim of bias on the part of a member of the commission when the court had found that the plaintiff was aware of the alleged bias at the time of the public hearing, (2) found that a member of the commission engaged in ex parte communication after the close of the public hearing and that the plaintiff did not waive the issue by failing to bring it to the attention of the commission during the public hearing, and (3) found that the other commissioners were influenced by the statements of a commission member who allegedly was biased. We disagree with the commission's claims.

Before we address the commission's claims, we set forth the applicable standard of review. "In reviewing a decision of a zoning board, a reviewing court is bound by the substantial evidence rule, according to which . . . [c]onclusions reached by [a zoning] commission must be upheld by the trial court if they are reasonably supported by the record. The credibility of witnesses and the determination of issues of fact are matters solely within the province of the [commission]. . . . The question is not whether the trial court would have reached the same conclusion . . . but whether the record before the [commission] supports the decision reached." (Internal quotation marks omitted.) *Cambo-*

*dian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 427, 941 A.2d 868 (2008).

"The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *DeSena* v. *Waterbury*, 249 Conn. 63, 72–73, 731 A.2d 733 (1999). In this case, the court drew conclusions of law on the basis of its factual findings, some of which were credibility determinations. See *Rutka* v. *Meriden*, 145 Conn. App. 202, 211–12, 75 A.3d 722 (2013) (court as trier of fact makes credibility determinations). Our review therefore is plenary.

I

The commission first claims that the court improperly predicated its decision, in part, on a claim of bias against a member of the commission when the plaintiff was aware of the bias during the public hearing. In support of its claim, the commission relies on the waiver rule articulated in *Moraski* v. *Connecticut Board of Examiners of Embalmers & Funeral Directors*, supra, 291 Conn. 262–63. We agree with the commission that *Moraski* requires a party to raise a claim of bias as soon as practicable at the risk of waiving it. We agree that, standing alone, the plaintiff waived a claim concerning Longhi's general bias predicated on the demise of the Longhi-Tallarita friendship. We disagree, however, that the *Moraski* waiver rule applies to the specific bias Longhi expressed with respect to the fate of "Tallarita's application" before the commission because the plaintiff did not learn of it until after the public hearing had been closed. The second incident of bias evidenced by Longhi's statement to DiPace is temporally and qualitatively different from the general bias arising from the Longhi-Tallarita friendship because the plaintiff did not learn of it until after the public hearing had closed and it was specific to the plaintiff's application.

"A claim of bias must be raised in a timely manner. The failure to raise a claim of disqualification with reasonable promptness *after learning of the ground* for such a claim ordinarily constitutes a waiver thereof. . . . One court has noted that a challenge to a judge for bias and prejudice must be made *at the first opportunity after discovery of the facts tending to prove disqualification.* . . . To hold otherwise would be to allow a litigant to pervert and abuse the right extended to him at the cost to the other party of unnecessary expense and labor and to the public of the unnecessary disruption of the conduct of the courts. . . . Moreover,

we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during the [hearing]." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 262–63.

"At the core of due process is the requirement for an impartial tribunal. . . . Due process demands . . . the existence of impartiality on the part of those who function in judicial or quasi-judicial capacities. . . . The applicable due process standards for disqualification of administrative adjudicators do not rise to the heights of those prescribed for judicial disqualification. . . . The mere appearance of bias that might disqualify a judge will not disqualify an arbitrator. . . . Moreover, there is a presumption that administrative board members acting in an adjudicative capacity are not biased. . . . To overcome the presumption, the plaintiff . . . must demonstrate actual bias, rather than the mere potential bias, of the board members challenged, unless the circumstances indicate a probability of such bias too high to be constitutionally tolerable." (Citations omitted; internal quotation marks omitted.) *Clisham* v. *Board of Police Commissioners*, 223 Conn. 354, 361–62, 613 A.2d 254 (1992).

Here, the court found that the plaintiff was aware of the falling out Tallarita had had with Longhi prior to the close of the public hearing on October 1, 2009. On those facts alone, the court concluded that any bias Longhi had toward the plaintiff could have been raised during the public hearing, and because the plaintiff failed to raise the claim, the claim was waived. Without having asked Longhi to disqualify herself on the basis of the falling out that she had with Tallarita, the commission was unable to discover facts related to the request for disqualification and create a record for review. *Moraski* instructs that a claim of bias must be raised at the first opportunity after the discovery of facts tending to prove bias and prejudice. *Moraski* v. *Connecticut Board of Examiners of Embalmers & Funeral Directors*, supra, 291 Conn. 262.[6]

We agree the bias predicated on the demise of the Longhi-Tallarita friendship alone was waived by the plaintiff. The record before the trial court and this court is devoid of any fact other than that Longhi and Tallarita were no longer on friendly terms. Without more, any claim of bias on Longhi's part, would have amounted to speculation. "[T]here is a presumption that administrative board members acting in an adjudicative capacity are not biased. . . . To overcome the presumption, the plaintiff . . . must demonstrate actual bias, rather than mere potential bias, of the board members challenged, unless the circumstances indicate a probability of such bias too high to be constitutionally tolerable." (Citation omitted; internal quotation marks omitted.)

*Clisham* v. *Board of Police Commissioners*, supra, 223 Conn. 362. The burden is on the plaintiff to prove a disqualifying interest. Id.

"In order to prove bias as a ground for disqualification, the plaintiff must show more than an adjudicator's announced previous position about law or policy . . . . He must make a showing that the adjudicator has prejudged adjudicative facts that are in dispute. . . . A tribunal is not impartial if it is biased with respect to the factual issues to be decided at the hearing." (Citations omitted; internal quotation marks omitted.) Id., 362. The plaintiff presented the court with no concrete evidence that Longhi, as a member of the commission, would not consider the plaintiff's applications in a fair and impartial manner simply because she and Tallarita were no longer on friendly terms. We cannot say the same, however, with respect to Longhi's statement regarding the fate of the plaintiff's applications made to DiPace.

The timing and subject of the statements Longhi made to DiPace remove that incident of bias from the ambit of the *Moraski* waiver rule. DiPace testified that in his presence, in 2006 or 2007, Longhi stated with respect to an application before the commission that she was "being screwed over by the town." Longhi, according to DiPace's testimony, was angry because Tallarita was not helping her and that she hoped "someday that he would get screwed over by the town." At trial, Tallarita testified that DiPace told him about Longhi's statements after the commission had denied the plaintiff's applications.[7] Once the public hearing had been denied, there was no avenue, other than on appeal, for the plaintiff to raise Longhi's bias. More importantly, Longhi's statements that DiPace heard were related directly to the applications being considered by the commission. Those statements demonstrated that she had prejudged the plaintiff's applications before the commission.

Even though the plaintiff did not know of Longhi's statements regarding the fate of an application submitted to the commission by the plaintiff or Tallarita until after the public hearing had closed, the commission claims that that incident is simply another piece of evidence that Longhi was biased. The commission supports that argument by quoting a single sentence from *Clisham*; id.; i.e., "We do not look at each piece of evidence in isolation and treat it as a separate and distinct claim of bias." After reviewing *Clisham*, and placing that sentence in context, we conclude that the court properly considered the plaintiff's claim of bias related to Longhi's statement to DiPace.

*Clisham* concerned the removal of a Naugatuck chief of police following the election of a new mayor who appointed new members to the board of police commissioners. *Clisham* v. *Board of Police Commissioners*, supra, 223 Conn. 356–57. In that case, the police chief asked certain members of the board of police commis-

sioners to disqualify themselves from reviewing charges that had been brought against the police chief. None of the police commissioners recused himself. Id. During the course of the proceedings, the police chief discovered additional evidence of bias on the part of one of the police commissioners, Edward Mason, and brought it to the attention of the board. Id., 358. The board of commissioners, including Mason, had removed the police chief from office. Id., 359. The police chief appealed to the trial court, which found that although the police chief timely raised a claim of bias, the initial evidence was insufficient to disqualify Mason. Id., 368. The trial court declined to consider the additional evidence of Mason's bias, and denied the police chief's appeal. Id.

The police chief took a further appeal that was heard by our Supreme Court. Although the *Clisham* facts are complicated, the court analyzed the essential facts as to bias as follows. "[O]nce the [police chief] raised his claim of bias following the publication of Mason's statement in the Waterbury Republican, a claim that the board concedes was timely, the prior evidence of bias was relevant to substantiate that claim. The [police chief's] claim was based upon evidence of bias that was cumulative in nature. We do not look at each piece of evidence in isolation and treat it as a separate and distinct claim of bias. Rather, to determine whether there was actual bias or a probability of such bias too high to be constitutionally tolerable . . . we look at the uncontroverted evidence of Mason's role as an advisor and consultant to [the new mayor] both before and after the mayoral campaign, his participation in the illegal meeting of a quorum of board members, his attempt to amend the regulations to eliminate the unanimity requirement *and* his statement to [the reporter] of the Waterbury Republican during the pendency of the removal hearing. The plaintiff cannot, therefore be deemed to have waived his claim that Mason was impermissibly biased." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 369.

*Clisham* instructs that generalized claims of bias are not sufficient to disqualify a member of an administrative commission and once specific evidence of bias is discovered, a plaintiff must raise the claim as soon as practicable. In this case, the plaintiff did not have specific evidence of Longhi's bias to raise during the course of the public hearing. Once the plaintiff knew of Longhi's statement DiPace heard concerning the fate of any application Tallarita submitted to the commission, it raised the claim of bias in the only procedural avenue available, that is, on appeal to the trial court. During the proceedings before the trial court, both the plaintiff and the commission were permitted to present evidence with respect to the alleged bias. The constitutional due process requirements therefore were met. *Clisham* also teaches that evidence of bias may be

cumulative; specific evidence of bias is not examined in isolation. We therefore conclude that the court properly considered the plaintiff's evidence of bias.

## II

The commission's second claim is that the court's findings that a member of the commission engaged in an ex parte communication with respect to the plaintiff's applications and that the plaintiff had not waived its claim by failing promptly to bring said communication to the attention of the commission are clearly erroneous. We disagree.

When reviewing a trial court's factual findings, appellate courts apply the clearly erroneous standard of review. *Petrucelli* v. *Travelers Property Casualty Ins. Co.*, 146 Conn. App. 631, 638, 79 A.3d 895 (2013), cert. denied, 311 Conn. 909,      A.3d      (2014). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Bailey* v. *Lanou*, 138 Conn. App. 661, 667, 54 A.3d 198 (2012). "Moreover, it is the exclusive province of the trier of fact to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony. . . . Thus, if the court's dispositive finding . . . was not clearly erroneous, then the judgment must be affirmed. . . . The function of the appellate court is to review, and not retry, the proceedings of the trial court." (Internal quotation marks omitted.) *Keith E. Simpson Associates, Inc.* v. *Ross*, 125 Conn. App. 539, 543, 9 A.3d 394 (2010).

The court found that Longhi met with Meade of the Hazardville Water Company in early October, 2009. The commission claims that the court's finding is clearly erroneous because Longhi testified that Meade must be confused because she met with him at another time with respect to another property. The court found that Meade testified with confidence about the incident and that Longhi was not a credible witness.

We have reviewed the transcript of Meade's testimony in the trial court. On direct examination, Meade testified, in part, as follows:

"A. Yes, I was contacted by [Longhi].

"Q. And do you recall about when that occurred?

"A. Early October of 2009. Probably the first week, I don't know the exact date.

"Q. Okay. And do you recall what she was contacting you about in relation to the subdivision?

"A. Well, the meeting—I don't have a real clear recollection of the meeting, but I did put it in writing in an e-mail to Dave Frederick what it was about. And after reading the e-mail that I wrote it refreshed my memory that it had to do with fire flows and water pressures for the development."

On cross-examination, Mead testified, in part, as follows:

"Q. Do you have a specific recollection of being in a conference room on that matter?

"A. I have so many meetings with so many people I don't. The recollection is not real clear because I deal with a lot of developers and things. But what refreshed my memory was looking through my file on that project, and I did write the e-mail that I had the meeting. So you know, I wouldn't put something in . . . ."[8]

On the basis of our review of the record, we conclude that there was evidence in the record, to support the court's finding that Longhi spoke with Meade about the plaintiff's application in early October, 2009. Moreover, we are not left with a definite and firm conviction that the court's finding was clearly erroneous.

According to Meade, his meeting with Longhi took place in early October. The ex parte communication ipso facto occurred after the public hearing was closed on October 1, 2009. After the public hearing closed, the plaintiff could present no further evidence to the commission. See *Frito-Lay, Inc.* v. *Planning & Zoning Commission*, 206 Conn. 554, 568, 538 A.2d 1039 (1998). Moreover, Talarita learned of Longhi's statement after the applications were denied, and there was no way for the plaintiff to bring the matter to the attention of the commission. We conclude, therefore, that the court's finding that the plaintiff had not waived the claim of ex parte communication was not clearly erroneous.

### III

The commission's third claim is that the court's findings that the bias of one member of the commission deprived the plaintiff of a fair, honest, and legal determination and that the commission had not sustained its burden to demonstrate that the ex parte communication was harmless were clearly erroneous. We do not agree.

"While proceedings before zoning and planning boards and commissions are informal and are conducted without regard to the strict rules of evidence . . . they cannot be so conducted as to violate the fundamental rules of natural justice. . . . Fundamentals of natural justice require that there must be due notice of the hearing, and at the hearing no one may be deprived of the right to produce relevant evidence or to cross-examine witnesses produced by his adversary . . . . Put differently, [d]ue process of law requires that the parties involved have an opportunity to know the

facts on which the commission is asked to act . . . and to offer rebuttal evidence. . . . In short, [t]he conduct of the hearing must be fundamentally fair." (Citations omitted; internal quotation marks omitted.) *Megin* v. *Zoning Board of Appeals*, 106 Conn. App. 602, 608–609, 942 A.2d 511, cert. denied, 289 Conn. 901, 957 A.2d 871 (2008).

Although "zoning boards and commissions are entitled to technical and professional assistance in matters which are beyond their expertise . . . and that such assistance may be rendered in executive session, our Supreme Court has held that [t]he use of such assistance . . . cannot be extended to the receipt, ex parte, of information supplied by a party to the controversy without affording his opposition an opportunity to know of the information and to offer evidence in explanation or rebuttal." (Citations omitted; internal quotation marks omitted.) Id., 609; see also *Norooz* v. *Inland Wetlands Agency*, supra, 26 Conn. App. 569–70.

It is well settled that that "[a]n ex parte communication raises a rebuttable presumption of prejudice. Once the plaintiff has shown that an improper ex parte communication has occurred, the burden of showing that the communication was harmless shifts to the party seeking to uphold the validity of the zoning commission's decision." *Daniel* v. *Zoning Commission*, supra, 35 Conn. App. 597.

In this case, the plaintiff met its burden to prove that Longhi had an ex parte communication with Meade regarding its applications. See part II of this opinion. The court found that the commission failed to meet its burden to demonstrate that the ex parte communication was harmless. The court identified the relevant issue as whether there was sufficient water pressure to enable the fire department to put out a fire. The court reviewed the transcript of the October 15, 2009 meeting of the commission and found that Longhi's participation in the substantial discussions concerning the water pressure and fire flows was intense and that her questions were negative. It also found that she had discussed those issues with Meade. Moreover, the court found that the issues of water pressure and fire flow were substantial reasons the commission denied the plaintiff's applications. The court quoted from the commission's posttrial brief that "the sole issue of a technically complex nature was fire flow. Because this issue was left unresolved after the close of the public hearing, it was proper for the [commission] to deny the application." The court found that this argument overlooked Longhi's negative comments regarding the issue that were an integral part of the commission's deliberations. Longhi never disclosed her conversation with Meade to the other members of the commission. The court concluded that Longhi's actions were improper, prejudicial, and unfair to the plaintiff and ultimately concluded

that an honest, legal, and fair action was not made by the commission.

The commission's argument on appeal here is that the plaintiff failed to present any evidence that Longhi's comments influenced the votes of the other members of the commission. We disagree. The court reviewed the transcript of the hearing the commission held on October 15, 2009, to consider and vote on the plaintiff's applications. It found that Longhi had actively participated in the discussion and, in fact, dominated the discussion. On the basis of our review of the record, we conclude that the court's finding that Longhi influenced the other members of the commission was not improper. In conclusion, the plaintiff did not receive the fair hearing to which it was entitled, and we thus affirm the judgments of the trial court.

The judgments are affirmed.

In this opinion the other judges concurred.

[1] The commission's claims and arguments in each of its appeals are identical.

[2] Hereinafter in this opinion, references to Tallarita are to Patrick Tallarita alone.

[3] Longhi was not a member of the commission at that time.

[4] The court found that during the October 15, 2009 hearing, Longhi stated her expertise in planning and zoning matters because she was and had been an appraiser. The court found that Longhi's appraisal experience alone did not make her an expert on planning and zoning.

[5] In remanding the case to the commission, the court ordered that Longhi should not participate in any of the further public hearings or deliberations on the plaintiff's applications. It also ordered Longhi to recuse herself and other members of the commission not to consider her prior, or future, comments made with respect to the applications.

[6] In this opinion, we need not address whether Longhi sua sponte should have recused herself.

[7] On direct examination, Tallarita testified, in part, as follows:

"Q. So you hadn't heard, during the first public hearing, that [Longhi] had made a specific statement about her treatment at the hands of the town?

"A. Not that specific type of statement. [DiPace] may have approached me. Other people may have approached me . . . and you hear things and I knew that [Longhi] wasn't pleased with me because she felt that I wasn't trying to go far enough to try to help her in her plight with the town. But, the first time that . . . DiPace came to me was after the proceedings had started. It may have been, actually, after the decision was rendered."

[8] The transcript reveals that counsel for the commission interrupted Meade before he could complete his answer.