[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
These cases arise out of the employment of the plaintiff Pierre Chabot by the City of Waterbury's Department of Employment, Education and Grants Administration ("DEEGA"). On February 15, 1991, Chabot's employment with DEEGA was terminated. Chabot filed suit against the City of Waterbury (the "City") shortly thereafter, contending that his firing was in breach of his employment contract and that the grievance procedure concerning his termination of employment deprived him of due process of law. In 1993, the City sued Chabot for money damages, claiming that he had misappropriated City funds to his own personal use while employed at DEEGA. The cases were consolidated and tried to the court. Part I of this decision addresses Chabot's claims in the suit brought by him; Part II addresses the City's claims in its suit.
The court finds the facts as hereafter set forth. The plaintiff was first hired in April 1985 by the plaintiff's predecessor, Waterbury Area Job Training Administration ("WAJTA"). Funded by a federal grant, WAJTA trained unemployed CT Page 2592 workers so that they could become re-employed. The plaintiff was hired as a Dislocated Workers' Coordinator at a salary of approximately $17,500. Prior to taking this job, the plaintiff had worked as a waiter, a copywriter and a housing investigator. Chabot did not have a written employment contract; it was his understanding that his employment would last for as long as the federal grant which funded the agency continued. His job involved interviewing unemployed workers to see if they qualified for assistance.
The plaintiff later received several promotions, culminating with his appointment in July, 1989 as "operations manager," his first management position. His new annual salary was approximately $35,000. Despite the seemingly lofty title of "operations manager," Chabot was the most junior of the four management employees of DEEGA. Joseph Carrah was the administrator of DEEGA, in overall charge of its operations. John Bolinski was in charge of the fiscal operations of DEEGA Cynthia Ryan became director of DEEGA in July, 1989, after serving for two years as deputy director of operations. As director, Ryan was in charge of the programmatic aspects of DEEGA. Chabot always reported to Ryan, who reported to Carrah. Ryan and Bolinski also reported to Carrah. Carrah reported to then Mayor Joseph Santopietro because DEEGA operated as part of the Mayor's office.
The event which ultimately led to Chabot's firing was his acceptance of two bonuses late in 1989. On October 6, 1989, Chabot accepted a bonus check for $1,000. which was signed by both Carrah and Santopietro. He deposited the check to his bank account. In early December, Chabot accepted a second bonus check, this one for $3,000. which was dated December 6, 1989 and signed by Carrah. Ryan gave the plaintiff this check in an envelope which contained a note from Carrah thanking the plaintiff for his hard work and success in seeking additional grant funds for DEEGA. Again, Chabot deposited the check to his bank account. On each occasion, Chabot was aware that Ryan was also receiving a bonus, although he was unaware of the amount.
In December, 1989, Carrah established a deferred compensation plan for the management employees of DEEGA. Chabot learned of it when he and Ryan were called to a meeting in Carrah's office. Bolinski was present, as was a representative of Aetna Insurance Company. The plan was described as an incentive plan because participants would need to remain employed by the City CT Page 2593 for three years from 1989 in order to benefit from the plan. The amount of contribution was not addressed at the meeting. Chabot learned that DEEGA had contributed to the plan for his benefit when he received a letter from Aetna in January or February 1990, which showed that $7,500. had been contributed on his behalf. At no time during his employment or after his termination did the plaintiff receive any portion of this $7,500.
The plaintiff was suspended with pay from his employment with DEEGA on December 28, 1990 because of his acceptance of the two bonus checks. His "Loudermill" pretermination hearing was held on February 8, 1991 and on February 15, 1991, Santopietro terminated the plaintiff's employment with DEEGA in accordance with the recommendation of the hearing officer. The hearing officer found that the plaintiff "knew or should have known that the payment of these bonuses from grant accounts was improper." Thereafter, Chabot brought this suit against the City and also filed a grievance over his termination. The hearing officer on the grievance found that although the payment of the bonuses were improper, the plaintiff "was not in a position to know, or to be chargeable with knowing, that the bonus money represented by the two checks were [sic] improperly issued by his superiors . . ." He sustained the grievance and ordered the plaintiff reinstated His decision was later reversed by DEEGA officials.
 I
The plaintiff's first claim is that he was wrongfully discharged from his employment with DEEGA without just cause. He contends that just cause for his dismissal did not exist as required under DEEGA's Management Personnel Policies. The City disputes these contentions, asserting that Chabot's employment with DEEGA was terminable at will, without the need to establish just cause.
Statements in an employer's personnel manual may give rise to an express or implied contract between employer and employee.Finley v. Aetna Life Casualty Co., 202 Conn. 190, 198 (1987). To prevail on a claim of implied agreement between employer and employee, the plaintiff must prove by a preponderance of the evidence that the employer undertook a commitment to the employee that he could not be terminated without just causeCoelho v. Posi-Seal International Inc, 208 Conn. 106, 112
(1988). The evidence provided by the plaintiff at trial readily CT Page 2594 met this standard.
When hired by WAJTA in 1985, Chabot was given a copy of the agency's personnel policies and was required to sign a receipt for the policies. The policies contain a provision for a probationary period in order to evaluate an employee's work "in order to determine fitness for permanent status in the position." (Emphasis added.) Chapter 13 of the policies, entitled "Disciplinary Actions," enumerates twelve different types of conduct which "shall be sufficient cause for disciplinary action." Section 13-2.D. of the policies further provides:
 DISMISSAL — The WAJTA Director may terminate an employee. The employee must be given a written notice specifying the effective date of the termination, the charge the specific behavior and the dates (where appropriate) that support the charge, any circumstances affecting the severity of the discipline, and advice on right of appeal. (See Chapter 14).
(Emphasis added.)
DEEGA's management personnel policies were changed in 1989 Carrah and Santopietro approved new policies on October 23, 1989, to be effective from October 1, 1989. These policies also provide for a probationary period before appointment to a "permanent" position, and list twelve types of conduct which are to be considered "sufficient cause for disciplinary action." The policies further state that "[t]he Administrator may utilize any of the following options at any time or a combination thereof to fulfill disciplinary actions: Oral reprimand, written reprimand, suspension, probation, or dismissal."
Clearly, the plaintiff's employment with DEEGA was not terminable at will. The cited provisions of both policies are the very antithesis of employment terminable at will. Both personnel policies established that the plaintiff's "permanent" employment at DEEGA could be terminated only for sufficient cause as set forth in the policies. This was clearly the intention of the City as manifested by the words and provisions which were incorporated into both sets of policies. The City undertook a contractual commitment to the plaintiff that he could not be terminated without sufficient cause. CT Page 2595
The next issue is whether the City had sufficient cause to terminate the plaintiff's employment as it did in February, 1991. It must be noted first that the City did not give the plaintiff any detailed statement of the reason for the termination. Notice of his "Loudermill" hearing contained the following paragraph describing the purpose of the hearing:
 The purpose of the investigation is to review with you, certain perceived improprieties with respect to financial transactions and monies paid out to yourself and three other individuals. Please be informed that as a result of this hearing, discipline up to and including termination could result.
The February 15, 1991 letter which plaintiff received notifying him of the termination of his employment stated that the termination was pursuant to the recommendation of the hearing officer. A copy of the hearing officer's recommendation was enclosed in the letter. The recommendation to terminate was based on the finding that the plaintiff knew or should have known that payment of the bonuses was improper.
With respect to actual knowledge, Chabot testified credibly at trial that he did not know that payment of the bonuses was allegedly improper. The City does not point to any evidence of actual knowledge by the plaintiff, but relies instead on circumstantial evidence which, it contends, shows that the plaintiff should have questioned the propriety of the bonus payments.
The plaintiff credibly testified that he had no reason to question the bonus check for $2,000. which he received in early October, 1989, or the second bonus check for $3,000. in December, 1989. The first check was signed by both Carrah, the administrator of DEEGA, and Santopietro, the mayor and chief executive officer of the City. The second check was signed just by Carrah. Throughout 1989, the plaintiff and others at DEEGA worked hundreds of hours of uncompensated overtime at night and on weekends. In late 1988 Santopietro had designated DEEGA to be the sole City agency to apply for government grants because of DEEGA's past success in obtaining such grants. The workload of the agency therefore increased significantly, causing the plaintiff to work a substantial amount of unpaid overtime. In addition, just prior to receipt of the October bonus, the City was notified that it was a finalist for a grant from the CT Page 2596 prestigious Robert Wood Johnson Foundation. This was a special achievement resulting from the work of the plaintiff and others at DEEGA.
The plaintiff was also aware that a change to DEEGA's management personnel policies was in process which would authorize the payment of bonuses. It seemed appropriate to him that bonuses be paid in light of the extraordinary effort which he and others at DEEGA had made during 1989, culminating with finalist status for the Robert Wood Johnson Foundation grant. The envelope which contained the second check also held a handwritten note from Carrah expressing appreciation for Chabot's excellent work for DEEGA.
The first bonus check was drawn on a DEEGA checking account without any special designation. The second bonus check was drawn on a DEEGA checking account designated "Stewart McKinney Grant." The plaintiff did not notice the account name on either check and did not know if bonuses could be paid only from specific account. A major part of his work at DEEGA was the preparation of applications for grants. A part of that process is the drafting of a proposed budget for a grant. As a result of working on grant applications, Chabot knew that the Stewart McKinney Grant did not provide that grant funds could be used for payment of bonuses. However, he did not notice that the second check was drawn on the McKinney grant account. Moreover, he knew that DEEGA was funded by many sources, including the City of Waterbury and other non-grant sources.
When the plaintiff received his W-2 form for 1989, he assumed that his earnings as shown on the form included the two bonuses. When he found out at the end of 1990 that the bonus income was not included, he filed an amended tax return and paid additional taxes.
At the time of the receipt of the first bonus check in October, 1989, the plaintiff had been a managerial employee of DEEGA for only three months. He was the most junior member of DEEGA management and did not have responsibility for any of the agency's fiscal matters. He was not a signatory to any DEEGA bank accounts nor was it his responsibility to maintain DEEGA's financial or bank records. Chabot's responsibilities at DEEGA were in the program and grant application areas. He did not know the source of the funds which were used to pay the bonuses Significantly, the plaintiff was never told that he should keep CT Page 2597 the bonuses secret.
The City contends that the plaintiff should have questioned the payment of the bonuses, which the City contends were paid with federal grant funds from the federal Job Training Partnership Act ("JTPA"). JTPA funds are provided by grant from the federal government to the state labor department and from the state labor department to local municipal agencies including DEEGA. Use of the funds is governed by a "Master Plan" entered into by the state and the local government. The City contends that the plaintiff is chargeable with knowledge of all of the provisions of the Master Plan, a document some one hundred pages in length. The plaintiff, however, credibly testified that although he was aware of the existence of the Master Plan and the fact that it contained financial controls, he was not aware that it contained salary limitations nor did he know whether it prohibited use of JTPA funds for bonuses. The plaintiff did not know in 1989 whether JTPA funds were used to pay the bonuses nor did he have reason to question whether the bonuses came from JTPA funds because of his awareness that DEEGA was funded from a variety of sources.
The court finds based on the evidence presented and the credibility of the plaintiff's testimony that the plaintiff did not have reason to know that the bonus payments which received in October and December 1989 were allegedly improper. There can be no question that financial improprieties occurred at DEEGA in 1989 and 1990 involving at least Bolinski, Carrah and Santopietro. The evidence showed that Bolinski and Carrah moved money from various grant accounts into and out of checking accounts for other grants, making it difficult to trace the source of funds in any one account. Both Bolinski and Carrah ultimately plead guilty to federal embezzlement charges and Santopietro was later convicted of financial improprieties after a jury trial.
The focus in this case, however, with respect to the plaintiff's wrongful discharge claim, is the state of the plaintiff's knowledge in October and December, 1989, when he accepted the two bonus checks. (The court finds that the plaintiff's involvement with the Aetna deferred compensation plan was not part of the basis for his employment termination. His termination was based on the recommendation of hearing officer David Ryan and Ryan's recommendation was limited to the plaintiff's conduct in accepting the bonus checks. Ryan's CT Page 2598 recommendation makes no mention whatsoever of the deferred compensation plan.) As the factual findings of the court set forth above demonstrate, the plaintiff did not have actual knowledge of the alleged impropriety of the bonus payments nor did he have reason to question whether the payments were improper. The next issue is whether the plaintiff's unknowing acceptance of the bonus payments constitutes "sufficient cause" for the plaintiff's discharge.
Both the WAJTA personnel policies in effect when the plaintiff was hired in 1985 and the DEEGA management personnel policies implemented by Carrah in October 1989 set forth virtually the same grounds as sufficient cause for disciplinary action. Neither Ryan, the hearing officer who recommended the plaintiff's discharge, nor Santopietro, who actually terminated the plaintiff's employment, identified any specific ground of sufficient cause as set forth in the personnel policies. The grounds which might be considered applicable are as follows:
 Wilful misuse, appropriation, negligence or destruction of Administration property.
 Criminal, dishonest or other unsuitable conduct which interferes with effective job performance or has an adverse effect on the efficiency of the Administration's service.
 Any other conduct or action of such seriousness that disciplinary action is considered warranted.
The Connecticut Supreme Court has defined wilful misconduct as "intentional conduct designed to injure for which there is no just cause or excuse." Dubay v. Irish, 207 Conn. 518, 53 (1988). Our Appellate Court has described wilful misconduct as intentional misconduct "done purposely with knowledge, or misconduct of such a character as to evince a reckless disregard of consequences . . ." Greene v. Metals Selling Corporation,3 Conn. App. 40, 44 (1984). "`Wilful' implies bad purpose, wantonness and reckless indifference." Lazarcheck v. Administrator,Unemployment Compensation Act, 1 Conn. App. 591, 594
(1984).
The plaintiff's unwitting acceptance of the two bonus payments does not constitute wilful misuse or appropriation of DEEGA property because his conduct was not an intentional, CT Page 2599 knowledgeable, or reckless wrongdoing. Chabot did not have a bad purpose in accepting the two checks. Likewise, the plaintiff lacked the intent or knowledge necessary for criminal or dishonest conduct. The plaintiff's lack of knowledge or intent precludes any finding that his conduct was wilful or intentional, as required for termination of his employment.
The plaintiff has established by a fair preponderance of the evidence that his discharge from employment at DEEGA was wrongful in that the receipt of the bonuses was not sufficient cause for his termination. The only special defense plead by the City in its answer to the plaintiff's complaint was a claim of immunity. This special defense was not briefed by the City in any of the post-trial memoranda of law and is deemed abandoned. Collins v. Goldberg, 28 Conn. App. 733, 738 (1992).
As a remedy for his unjust discharge, the plaintiff seeks reinstatement to his position at DEEGA, money damages and attorney's fees and costs. The City opposes the award of any relief to the plaintiff, contending that the City discovered evidence of misconduct by the plaintiff after his termination which would have justified his termination if it had been discovered sooner.
"Generally, where an employee has been unlawfully terminated from employment, the remedy of reinstatement is to be applied by the court whenever possible." Kenny v. Civil ServiceCommission, 197 Conn. 270, 279 (1985). There are, however, many exceptions to this general rule. In Preston v. Phelps DodgeCopper Products Co., 35 Conn. App. 850, 858 (1994), a case of first impression, the Appellate Court reversed the trial court's refusal to charge the jury that they could consider after acquired evidence of the employee's wrongdoing in determining the amount of damages to be awarded. The Appellate Court further ruled that such evidence is appropriately considered with respect to reinstatement as well. "If the after acquired evidence, in and of itself, would have caused the employer to discharge the employee, it would be inappropriate to order reinstatement of employment . . ." Id. The employer bears the burden of proving that the after acquired evidence of wrongdoing was such that the employee would have been terminated on those grounds alone. McKennon v. Nashville Banner Publishing Co.,
___ U.S. ___, 115 S.Ct. 879, 886 (1995). If the employer meets that burden, "[i]t would be both inequitable and pointless to order reinstatement of someone the employer would have CT Page 2600 terminated and will terminate in any event and upon lawful grounds." Id., 886.
The City contends that prior to the plaintiff's termination, he misappropriated DEEGA funds by seeking and accepting reimbursement for expenses which were personal in nature and not business related. The most egregious incident involving such activity involved a business conference in Denver, Colorado. The conference was from Tuesday, October 2 through Friday, October 5, 1990 and Carrah, Ryan and the plaintiff were scheduled to attend. Carrah allegedly became ill shortly before they were scheduled to depart and he decided not to attend. He told Ryan and Chabot that they could take someone in his place because his airline ticket and conference costs were non-refundable. As a result, the plaintiff's mother joined Ryan and the plaintiff on the trip. They flew to Denver on Sunday, September 30, rented a car and drove to Vail, Colorado, where they went sightseeing and spent two nights before returning to Denver for the conference on Tuesday, October 2. After the conference was over, they drove to Colorado Springs and again went sightseeing. They spent two nights there before returning to Connecticut. Although Carrah had scheduled a business meeting in Colorado Springs, the meeting was cancelled. Nevertheless, the plaintiff, his mother and Ryan took the side trip and spent two nights in Colorado Springs.
The plaintiff sought and received reimbursement from DEEGA for: hotel rooms for himself and his mother in Vail and Colorado Springs, the car rental, a parking charge and some, although not all, meals for himself and his mother. Chabot instructed his mother to sign Carrah's name on all her guest checks and he then submitted those receipts to DEEGA for reimbursement. The receipts were false and misleading in that they made it appear that reimbursement was sought for expenses of Carrah and not of Ms. Chabot. The plaintiff was reimbursed by DEEGA for a total of $1,690.28 in expenses. In addition, the plaintiff submitted a false time report for Monday, October 1, 1990, reporting that he had worked when he had in fact been sightseeing in Vail.
DEEGA's management personnel policies contain the following provision with respect to reimbursement of expenses:
REIMBURSEMENT OF WORK RELATED EXPENSES
CT Page 2601
 Room and board (except alcoholic beverages) reimbursement while in attendance at assigned conferences, training sessions, or workshops, etc. will be provided in full by the Administration upon submission of receipts and appropriate documentation. Advances may be given to employees to attend such sessions/conferences at the discretion of the Administrator.
There is no dispute that the plaintiff's mother was not employed by DEEGA and that the sightseeing trips to Vail and Colorado Springs were personal in nature and were unrelated to the conference in Denver. In seeking and accepting reimbursement from DEEGA for these personal expenses, the plaintiff wilfully misused and appropriated DEEGA funds. The plaintiff argues that he did not act improperly because Carrah told him it was all right to take his mother on the trip because the hotel and air fare were prepaid and nonrefundable. This contention fails to recognize that Chabot went far beyond what Carrah suggested by obtaining reimbursement for hotel and meal expenses of both the plaintiff and his mother for the side trips to Vail and Colorado Springs.
DEEGA's personnel policies provide that wilful misuse or appropriation of DEEGA property is grounds for discipline, including dismissal. The court finds that the plaintiff's employment with DEEGA would have been terminated for misappropriation of at least $1,690.28 in DEEGA funds if the City had known of the misappropriation. The City did not learn of to misappropriation until approximately May 15, 1991, when the results of a special accounting review of DEEGA's financial operations were presented to the City.
The court finds that reinstatement of the plaintiff would be inappropriate in light of the after acquired evidence of the plaintiff's wrongdoing. As the Supreme Court stated inMcKennon, "It would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate in any event and upon lawful grounds."McKennon v. Nashville Banner Publishing Co., supra,115 S.Ct. 879, 886.
As an alternative to reinstatement, the plaintiff seeks money damages for back pay and accrued fringe benefits. In a recent appeal, our Supreme Court addressed the rule of damages for wrongful termination of employment. The court first cited CT Page 2602 the general rule for breach of contract cases, that an award of damages is designed to place the injured party in the same position that he would have been in if the contract had been performed. Torosyan v. Boehringer Ingelheim PharmaceuticalsInc., 234 Conn. 1, 32 (1995). The court then applied that rule to the wrongful termination situation, concluding that when an employee is wrongfully fired, he or she can recover the wages which he or she would have earned under the contract minus wages which the employee earned or could have earned elsewhere. Id.,32-33. The Torosyan case did not, however, involve after acquired evidence of wrongdoing. The Appellate Court considered that issue in Preston v. Phelps Dodge Copper Products Co.,
supra. The issue on the appeal was
 whether the jury should have been allowed to consider the plaintiff's misconduct, discovered by Phelps after his discharge, and to decide whether that misconduct limited any award of damages. We conclude that the jury should have been instructed that it could consider the misconduct and that it was plain error for the trial court not to have instructed the jury as requested . . .
Id., 857-858. Applying the rule in both these cases to the present action results in a finding that the plaintiff can recover the lost wages which he would have earned from February 16, 1991, the date of his termination of employment, until May 15, 1991, the date when the City learned, after his termination, of his prior misappropriation of DEEGA funds as reimbursement for personal travel for himself and his mother. The plaintiff's salary at the time of his discharge was $41,190 per year. Three months' salary would have been $10,297.50.
The City is entitled to a deduction from these wages for any wages which the plaintiff did earn or could have earned elsewhere during the same time period. Torosyan v. BoehringerIngelheim Pharmaceuticals Inc., supra, 234 Conn. 33. The City as employer bears the burden of proof on the deduction. Id. At trial the plaintiff testified that he received unemployment compensation until October, 1991, when he accepted a job as a waiter at a New Haven restaurant. The plaintiff's 1991 federal income tax return shows that he received unemployment compensation totalling $7,550 in 1991. $2,831.25, three months of unemployment compensation benefits, should be deducted from the lost wages of $10,297.50. The plaintiff's net wage loss from CT Page 2603 February 1, 1991 until May 15, 1991 was $7,466.25 and judgment is entered for the plaintiff against the City on the first count of the plaintiff's complaint for damages of $7,466.25.
The plaintiff also claims compensation for fringe benefits consisting of accrued vacation time, sick time, personal days, compensatory time and birthday leave. The City responds first by claiming that the plaintiff failed to allege a claim for fringe benefits. A review of the pleadings shows that the plaintiff did not allege a claim for fringe benefits in the complaint which he brought against the City. However, the plaintiff did allege a claim for fringe benefits in the third count of the counterclaim which he filed in the action brought by the City.
The plaintiff testified that he was entitled to thirty-two days' vacation time, 804 hours of "comp" time, 70 days of sick time and a birthday leave day as of the time his employment was terminated. The plaintiff also admitted into evidence an undated, typewritten sheet of paper which purports to state the following for Carrah, Ryan and the plaintiff: Start date, salary, vacation time, sick time. A category purporting to show personal time is crossed out with a pen or pencil as is a statement of 809 hours of comp time under the plaintiff's name. It is unclear from the exhibit whether the days for vacation and sick time represent accrued but unused time or the amount of time already used by the named individuals.
Although plaintiff testified he was owed thirty-two days' vacation, the exhibit reads: "Vacation: 35 days — 2 hours $5,589.96." In an exhibit to one of his post-trial memoranda, the plaintiff claims the following for the calendar year 1991: 17 vacation days, 18 days sick time, five personal days and one day for birthday leave. With respect to sick leave, DEEGA's management personnel policies concerning sick leave provide for "full payment on all accumulated leave" upon an employee's layoff or voluntary termination of employment. The policies are silent with respect to payment in the event of termination for just cause.
The City contends that the plaintiff produced insufficient evidence in support of his claim for damages for lost fringe benefits. The court agrees. The only evidence presented on this point was the plaintiff's brief testimony and the one page exhibit. The plaintiff's testimony conflicted with the content CT Page 2604 of the exhibit. Furthermore, the ability of the plaintiff to claim an award for these benefits under the personnel policy when his employment was terminated for just cause is unclear. The plaintiff failed to establish his claim for an award for fringe benefits by a preponderance of the evidence.
In the second count of his amended complaint, the plaintiff alleges that the post-termination grievance process violated his constitutional right to due process. Although the allegations of the second count are quite general, the plaintiff in his post-trial memorandum clarifies his claim. He claims that the administrators who reviewed the hearing officer's decision on his grievance should have been bound by the hearing officer's factual findings. He also contends that the administrators who ultimately ruled on the grievance decision were not impartial, thereby denying his right of due process.
After his termination, the plaintiff submitted a grievance contending that there was not just cause for his termination. The grievance was heard by an attorney, Frederick McKone. McKone sustained the grievance and ordered reinstatement of the plaintiff, finding that the plaintiff did not know nor should he have known that the payment of the two bonuses was improper. In accordance with DEEGA's grievance procedures, the hearing officer's decision was submitted to DEEGA's then administrator, who was to "either approve the Hearing Officer decision or change the decision in writing." Beth Barton Mala, DEEGA's acting administrator in September, 1991, allegedly "changed" the decision by finding that the plaintiff was properly terminated. The hearing officer subsequently reopened the hearing and took additional evidence, but then reaffirmed his initial decision. The second decision was then submitted to John Lombardo, the executive director of DEEGA in November, 1991. He also allegedly "changed" the decision by finding that the plaintiff was properly terminated. The plaintiff appealed Lombardo's decision to the JTPA Director at the Connecticut Labor Department, Eli Gussen, who affirmed Lombardo's decision and determined that the plaintiff was afforded due process under the requirements of the JTPA Act.
The plaintiff alleges that both Mala and Gussen were not impartial decision-makers. The plaintiff contends that Mala appeared as a witness for the City during the grievance process and that Gussen was involved in the December, 1990 decision to suspend the plaintiff and the February, 1991 decision to CT Page 2605 terminate him. However, a claim of bias must be raised in a timely manner. Clisham v. Board of Police Commissioners,223 Conn. 354, 367 (1992). The claim must be raised reasonably promptly after the party learned of the basis for the bias claim. Id. Here, the plaintiff failed to show that he at any time moved to disqualify Mala or Gussen on the grounds of bias or partiality, although he clearly knew of the basis of the claimed impartiality before Mala and Gussen issued their decisions. The failure to have requested disqualification promptly constitutes a waiver of the claim. See Bartlett v.Krause, 209 Conn. 352, n. 20 (1988).
The plaintiff's second claim with respect to the grievance process is that Mala and Lombardo should have been bound by McKone's factual findings in their review of his decision. Because of the reopening of the grievance hearing after Mala's review, her decision to change McKone's ruling was superseded by Lombardo's review of McKone's decision after the rehearing. In changing McKone's conclusion, Lombardo provided the following rationale:
 After careful review of the Hearing Officer's Decisions dated August 12, 1991 and November 8, 1991, the entire record, including but not limited to transcripts of the testimony, exhibits entered into evidence, and the position of the parties as stated in their briefs, I believe insufficient weight and credibility was provided to . . .
Lombardo's decision then recites numerous factual findings of the hearing officer. This explanation does not show that Lombardo changed any of the hearing officer's factual findings. Instead, he gave different weight to the facts found and arrived at a different conclusion. In an analogous situation involving the termination of a tenured teacher, our Supreme Court found that the board of education was bound by the factual findings of an impartial hearing panel, but not by its conclusions or its recommendations. Petrino v. Board of Education, 179 Conn. 428,430 (1980). Like the school board in Petrino, Lombardo did not abuse his discretion by attributing different weight to the facts found by the hearing officer.
The plaintiff makes a third due process claim as well. He contends that DEEGA's grievance procedures "were defective in that they did not comply with state mandates based upon federal CT Page 2606 regulation." Such a claim is nowhere alleged in the plaintiff's complaint in the action which he brought or in the counterclaim which he filed in the action brought by the City. The plaintiff's right to recover is limited to the allegations of his complaint. Lemoine v. McCann, 40 Conn. App. 460, 464 (1996). This claim is not properly before the court. The court finds for the City on the second count of the plaintiff's complaint.
In the sixth count of his counterclaim in the action brought by the City, the plaintiff alleges a violation of42 U.S.C. § 1983. The plaintiff's two initial memoranda of law failed to address the § 1983 claim at all. The court therefore directed additional briefing to address the claim in the event that the plaintiff was not abandoning it. The plaintiff filed a supplemental brief on the § 1983 claim which generally described the cause of action under 42 U.S.C. § 1983 and then referred the court back to his earlier brief on due process violations. Having found no merit to any of the plaintiff's claimed due process violations in the earlier briefs, the court finds no merit to the plaintiff's claim under 42 U.S.C. § 1983.
 II
The City's complaint seeking judgment for money damages for City funds allegedly misappropriated by Chabot from DEEGA is set forth in four counts. The City pleads breach of a fiduciary duty, breach of the obligation of good faith and fair dealing, conversion and a civil RICO claim under federal law, 18 U.S.C. § 1961
et seq. The civil RICO cause of action is set forth in the third count of the City's complaint, in which the City seeks treble damages and attorneys' fees under RICO in addition to monetary damages.
In the RICO count, the City alleges that the plaintiff conspired with Carrah, Bolinski and Ryan to deprive the City of grant funds for DEEGA through a pattern of racketeering activity. Five elements must be shown in order to establish a RICO claim: (1) the existence of an "enterprise"; (2) that the enterprise affected interstate commerce; (3) that the defendant was employed by or associated with the enterprise; (4) that he participated, even indirectly, in the affairs of the enterprise; and (5) that he participated through a "pattern of racketeering activity." Martin-Trigona v. Smith, 712 F.2d 1421, 1426 and n. 6 (D.C. Cir. 1983). CT Page 2607
A "pattern of racketeering activity" is defined in18 U.S.C. § 1961 as including at least two "predicate acts" of racketeering activity. 18 U.S.C. § 1961(1)(B) defines "racketeering activity" as any act for which an indictment can be brought under specified sections of the United States Code. Among the specified sections are 18 U.S.C. § 1952, concerning interstate and foreign travel, and 18 U.S.C. § 1956, concerning money laundering. The City contends that the evidence showed that Chabot and the alleged co-conspirators engaged in racketeering activity with respect to DEEGA in several respects, including the acceptance by Chabot of the two bonus checks. The City claims that Chabot's acceptance of the bonuses is a predicate act of racketeering under 18 U.S.C. § 1956(a), which makes liable a person who
 knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity . . .
This section requires actual knowledge that the property involved represents the proceeds of some unlawful activity as well as an intent to "promote the carrying on of specified unlawful activity." This court has previously found that Chabot did not know that the bonuses were allegedly improper or unlawful. The acceptance of the bonuses without actual knowledge that they were the proceeds of some unlawful activity is not an act within the scope of 18 U.S.C. § 1956.
The City also contends that the "acceptance" by Chabot of the deferred compensation account established on his behalf with Aetna Insurance Company is a predicate act of racketeering. The City failed to prove at trial, however, that Chabot had actual knowledge, as required under 18 U.S.C. § 1956(a), that the City's contribution to the account on his behalf was allegedly illegal. Therefore, this claim is likewise without merit. (Moreover, Chabot has not received and will never receive any benefit from the establishment of the deferred compensation account. He cannot qualify for the deferred compensation because he was not employed at DEEGA for three years following the establishment of the account, the threshold requirement under the terms of the account.) CT Page 2608
Although the City alleged numerous predicate acts of racketeering in its complaint, many were not proven at trial and others were not briefed in post-trial memoranda. In its post-trial memorandum dated March 22, 1995, the City cited the bonuses, the deferred compensation plan and three other acts as predicate acts of racketeering. The City's failure to brief the remaining acts alleged in the complaint constitutes abandonment of those claims. Collins v. Goldberg, supra, 28 Conn. App. 738. The three remaining predicate acts claimed by the City relate to interstate travel by Chabot while employed by DEEGA to Colorado, Atlantic City and San Diego. The City contends that Chabot's conduct on or in connection with these trips are predicate acts because they are indictable under 18 U.S.C. § 1952(a), which makes liable a person who
 travels in interstate or foreign commerce or uses the mail or any facility in interstate commerce with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity and thereafter performs or attempts to perform an act described in paragraph (1) or (3) . . . or (2) . . .
(Emphasis added.) The City failed to sustain its burden of proving that Chabot acted with the required intent. Allegation and proof of such intent are required by 18 U.S.C. § 1952(a).City of Waterbury v. Santopietro, Superior Court, judicial district of Waterbury, Docket No. 117006 (August 11, 1994). The City further failed to prove that Chabot "thereafter" performed one of the acts described in 18 U.S.C. § 1952(a)(1), (2) or (3). The City therefore failed to sustain all of its claims under RICO.
In the fourth count of its complaint, the City alleges that Chabot wrongfully converted public monies from DEEGA grant funds for his own personal use. Conversion occurs when one person assumes and exercises the right of ownership over property belonging to another, to the exclusion of the owner and without authorization. Luciani v. The Stop Shop Companies. Inc.,15 Conn. App. 407, 409 (1988). The City contends that Chabot converted the following funds: (a) $5,100.00 in bonuses (in addition to the two bonuses totalling $5,000.00, all DEEGA employees, including Chabot, received a $100 bonus in December, 1989); (b) the $7,500. paid to Aetna for Chabot's deferred CT Page 2609 compensation account; and (c) $12,160.35 in reimbursement paid to Chabot for which proper substantiation (receipts, etc.) could not be found. (This figure includes the $1,690.28 in expense for the Colorado trip.)
After financial improprieties at DEEGA were brought to the attention of the City in late 1989, the City retained Scully 
Wolf, a firm of certified public accountants, to review DEEGA's financial operations from April 1, 1989 to December 31, 1990. The firm rendered its report to the City on May 15, 1991. The report showed that many DEEGA checks had been written and paid for expenses, wages, reimbursement of business expenses and other items without adequate documentation to justify the payments, such as bills, invoices, receipts, etc. (The report also showed that many reimbursement requests, including requests made by Chabot, were properly substantiated.) The total amount paid Chabot for which the accounting firm could not find adequate documentation was $12,160.35, exclusive of the $5,100. in bonuses and the deferred compensation contribution.
DEEGA's management personnel policies provide that work-related expenses will be reimbursed by the agency "upon submission of receipts and appropriate documentation." Chabot's acceptance of $12,160.35 in DEEGA funds without having submitted appropriate documentation constitutes conversion of DEEGA funds and judgment will be entered against Chabot for that amount.
The City also alleges that Chabot converted $5100. in bonuses as well as the $7,500. contributed by the City to the Aetna deferred compensation plan for Chabot's benefit. The was conflicting evidence at trial with respect to the source and propriety of the payment of the bonuses to Chabot. When the payment of bonuses was initially discovered, it was believed that the bonuses were paid from JTPA funds, which cannot legally be used for such purposes. However, the Scully Wolf review report does not substantiate this conclusion. The report identifies the many instances in which funds were transferred between accounts. A section of the report which addresses the December bonus payments, including $3,000. to Chabot, states,
 A worksheet found in the accounting records (Exhibit B-7) indicates these were longevity payments and that the source was the JTPA drawdown account; our tracing to source documents does not confirm this assertion.
CT Page 2610
(Emphasis added.)
The confusion about the actual source of the funds used to pay the bonuses was not clarified by the testimony. The Scully 
Wolf accountant who testified did not identify the source of the funds paid as bonuses. The court finds that the City failed to sustain its burden of proving by a fair preponderance of the evidence that the bonuses paid to Chabot were from JTPA funds.
The $7,500 contribution to the Aetna deferred compensation account for the benefit of Chabot was made by a DEEGA check dated December 21, 1989 and signed by Carrah. There was no evidence that Chabot handled the check or the funds represented by the check. The check amount was $30,000. because it established accounts for Chabot, Carrah, Bolinski and Ryan. Chabot never received any disbursement from the account and is ineligible for any future payment from the account because he would have had to remain in the employ of DEEGA for three years to qualify for disbursement. Given these facts, the court finds that Chabot never exercised dominion over the $7,500. at issue and therefore cannot be found to have converted the funds. These factual findings also preclude judgment in favor of the City on the first and second counts of its complaint. The court further notes that although Chabot filed five special defenses to the City's complaint, he briefed none of these in his post-trial memoranda and they are accordingly deemed abandoned.Collins v. Goldberg, supra, 28 Conn. App. 738.
Judgment is entered in favor of the plaintiff Pierre Chabot in his action against the City on the first count of his complaint for damages of $7,466.25. Judgment is entered for the City on all of the remaining claims of Chabot. In the action brought by the City, judgment is entered on the fourth count of the complaint against Chabot for damages of $12,160.35. Judgment is entered for Chabot on all of the remaining claims of the City.
VERTEFEUILLE, J.