[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, an Ohio limited partnership, appeals from a final decision dated October 23, 1998 from the Department of Environmental Protection ("DEP") hearing officer Donald Levenson which affirms order number SRD-088 issued by the Commissioner of Environmental Protection requiring the plaintiff to undertake extensive investigatory and remedial actions with regard to portions of a 335 acre parcel of land known as 392 and 460 Squaw Hollow Road (also known as Route 44) in Ashford and Willington, Connecticut. The appeal is brought pursuant to the Uniform CT Page 6268 Administrative Procedure Act ("UAPA"), General Statutes §§ 4-166
et seq. and 4-183.
The Commissioner's order alleged that the plaintiff had created or was maintaining a facility or condition which reasonably can be expected to create a source of pollution to the waters of the state; and further alleged that the plaintiff was maintaining a solid waste disposal facility without a permit on its property in the towns of Ashford and Willington. The plaintiff filed a timely appeal from the order and public hearings were held by a DEP hearing officer on November 24 and 25, December 3, 11 and 17, 1997.
The Commissioner's order of August 15, 1997 was issued pursuant to his authority under Connecticut's Water Pollution Control Act, General Statutes § 22a-416 et seq. and the Solid Waste Management Act, General Statutes § 22a-207 et seq.
Substantial evidence in the record supports the hearing officer's findings which are essentially as follows. The site consists of 294 acres in the town of Ashford and 41 acres in the town of Willington. The site contains two ponds, Moritz Pond in the eastern portion of the site and a man-made pond in the south central portion of the site. The site also includes intermittent water courses, with approximately one third of the site constituting inland wetlands. Pursuant to Connecticut water quality standards adopted in accordance with General Statutes §22a-426 as revised April 12, 1996, the groundwater at the site is classified as "GA". Groundwater classified as "GA" should be suitable to serve as a source of public or private water supply without treatment and should contain no chemical or biological constituents other than those of natural origin.
During the period from 1967 through 1972, Benjamin Schilberg, doing business as Schilberg Iron Metals, leased approximately 10,000 square feet of this northwest portion of the site. On the leased portion of the site, Schilberg burned insulated copper wire to recover the copper for resale. The ash resulting from the burning process was stored on site until a truck load of ash had accumulated every month or so and was removed. The area surrounding and including the portion of the site leased by Schilberg is known as the "Northwest Disposal Area".
Sometime prior to 1965, a barn and residence were constructed on the south central portion of the site along Route 44. During CT Page 6269 the period between 1965 and 1970, Thomas Nigro, a former owner of the site constructed a restaurant east of the residence and barn. The restaurant was operated until approximately 1980. Nigro also operated a tractor sales and service and scrap metal operation at the site using the barn as a garage. The restaurant, residence and barn were destroyed by a fire in approximately 1980. On or about 1990, the then owner of the site, Ashford Development Corporation ("ADC"), demolished the burned structures and disposed of the burned debris on the site without a permit. The portion of the site, including the location of the former restaurant, residence and barn/garage is referred to as the "South Central Disposal Area".
The DEP received complaints about potential pollution at the site as early as 1977. In 1991 and 1992, DEP staff conducted several investigations of the site and took surface soil samples. The DEP staff conducted three or four additional site investigations between 1992 and 1997. In 1993, Shawmut Bank, a former mortgagee of the property, hired a private environmental consultant, Rizzo Associates, Inc.("Rizzo"), to investigate environmental conditions at the site. In February of 1993, Rizzo conducted a Level 1 investigation consisting of a site inspection, review of the site's history and files of relevant state and local agencies. Rizzo conducted a more detailed second or Level II investigation in late 1993 and early 1994. The Level II investigation focused on the Northwest Disposal Area because of its known contamination and on the South Central Disposal Area because of its history of extensive activity. In conducting the Level II investigation, Rizzo took soil samples, dug test pits and groundwater monitoring wells in the Northwest and South Central Disposal Areas.
During its 1991 and 1992 site inspections, DEP staff observed that the portion of the site formerly leased by Schilberg was devoid of vegetation and contained pieces of charred wire. The soil in this area was stained a blue-green color. The blue-green color of the soil was probably the result of copper oxidation associated with the wire-burning activities. A mass analysis DEP soil samples from the Northwest Disposal Area revealed lead levels of 8200 parts per million ("ppm"), copper levels of 61,000 ppm, barium levels of 170 ppm and cadmium levels of 7.2 ppm. A mass analysis of background samples taken by DEP staff at the same time from undisturbed areas of the site revealed lead levels of 32 ppm, copper levels of 48 ppm, barium levels of 18 ppm and cadmium levels of 0.25 ppm. The lead and copper levels detected CT Page 6270 by DEP staff in the Northwest Disposal Area exceed the Direct Exposure Criteria ("DEC") of the remediation standards[1]
indicating that the soils pose a threat to human health.
DEP staff twice analyzed soil samples from the Northwest Disposal Area using the Toxicity Characteristics Leaching Procedure ("TCLP") developed by the federal Environmental Protection Agency. Those analyses revealed a concentration of 90 and 140 ppm for lead, 420 and 520 ppm for copper, 2.2 and 3.1 ppm for barium, and 0.01 and 0.09 ppm for cadmium.
Rizzo also analyzed soil samples from the Northwest Disposal Area using the TCLP process and detected lead and barium in six of its eight samples at concentrations ranging from 4.9 to 98 milligrams per liter ("mg/L") and 0.6 to 2.9 mg/L, respectively. Rizzo also detected cadmium in four of its soil samples in concentrations ranging from 0.1 to 0.2 mg/L and silver in one sample of concentration of 0.1 mg/L.
Rizzo also analyzed the soil from its test pits in the Northwest Disposal Area. Soil in three of the test pits contained lead at concentrations ranging from 1.5 mg/L to 31 mg/L, and the presence of cadmium in one of those pits at a concentration of 0.1 mg/L.
All the concentrations of the various substances detected by the DEP staff and Rizzo in the soils of the Northwest Disposal Area exceed the relevant pollution mobility criteria of the remediation standards[2] indicating that those soils pose a threat to groundwater quality.
The concentration of lead in these soils exceed the federal threshold of 5 parts per million set in 40 C.F.R. § 26.24 as well as the Connecticut Standard RCSA § 22a-444(c)-100 et seq. The soils thus constitute hazardous waste under 42 U.S.C. § 6901 et seq. and General Statutes § 22a-448(3). The Rizzo test pits in the South Central Disposal Area reveal the presence of Total Petroleum Hydrocarbons ("TPH") at levels of 12, 000, 5,300 and 180 milligrams per kilogram ("mg/kg"). Rizzo's analysis of soil samples from two of its three well borings in the South Central Disposal Area also revealed TPH at concentrations of 5,100 and 59 mg/kg. Three of the five TPH concentrations in the soils of the South Central Disposal Area exceed the Pollution Mobility Criterion for TPH of 500 mg/kg. The TPH in the soils of the South Central Disposal Area is reasonably likely to pollute the CT Page 6271 groundwaters of the state and pose a threat to human health.
Rizzo detected TPH in all five of its groundwater monitoring wells in the Northwest Disposal Area at concentrations ranging from 0.5 to 5.5 mg/L. Duplicate samples taken by Rizzo from its monitoring well RIZ-3 in the Northwest Disposal Area revealed the presence of the Volative Organic Compound[3]
("VOC")toluene[4] at concentrations of 2.7 mg/L and 3.5 mg/L. Rizzo also detected barium in all of its wells in the Northwest Disposal Area at concentrations ranging from 0.02 mg/L to 0.06 mg/L.
In the South Central Disposal Area, Rizzo detected TPH in three of its four monitoring wells at concentrations ranging from 0.8 to 3.0 mg/L and barium in two of its wells at concentrations of 0.03 mg/L and 0.09 mg/L. Rizzo also detected the VOCs toluene and acetone at concentrations of 5.7 micrograms per liter ("ug/L") and 23 ug/L, respectively, in one well, and another VOC, CIS-1,2-dichloroethene, at a concentration of 3.2 ug/L, in another well.
Rizzo drilled another monitoring well outside the South Central Disposal Area, south of the wetlands near the former restaurant, because of a report in the DEP's files which indicated that contaminants might have been dumped in these wetlands. Rizzo detected TPH in that well at a concentration of 0.9 mg/L and three VOCs (tuluene, xylene and acetone) at concentrations of 16, 4.3 and 33 ug/L, respectively.
All but one of the TPH concentrations detected in the groundwater of the site exceed the Groundwater Pollution Criterion of the Remediation Standards of 0.5 mg/L for groundwater designated GA. See RCSA § 22-133k-3. TPH concentrations are of particular health concern because of the carcinogenic compounds in TPH. The TPH and VOCs detected in the groundwater of the site are not naturally occurring and therefore exceed the criteria established in the water quality standards for groundwater classified as GA.
Groundwater in the Northwest Disposal Area flows southeasterly towards the onsite wetlands, and in the South Central Disposal Area flows easterly towards the manmade pond.
In its site inspections in 1991 and 1992, DEP staff observed over 10 cubic yards ("c.y.") of soLd waste on the surface of the CT Page 6272 Northwest Disposal Area including wood, tires, vehicle parts, household appliances and household refuse. DEP staff also observed two piles of demolition debris and another pile of wood debris, each in excess of 10 c.y., and approximately a dozen empty drums in the South Central Disposal Area near the former restaurant. In the area between the former restaurant and the man-made pond, DEP staff observed man-made fill with waste materials, scrap metal and machine gears sticking out of the soil.
In the area north of the South Central Disposal Area, DEP staff observed two piles of fill, each in excess of 10 c.y., containing cement blocks, empty metal drums, wooden demolition debris, piping and scrap metal.
In the northeast corner of the site, DEP staff observed a flat area, almost the size of a football field, which appeared to have been recently leveled off. The area had wire, vehicle parts and metal containers sticking out of its surface.
Rizzo discovered solid waste in four of its eight test pits in the Northwest Disposal Area. The solid waste included wood paneling, household trash, broken brick masonry, wire, scrap metal and wood. Rizzo also found solid waste in seven of its eighteen test pits in the South Central Disposal Area, including plastic, wood, masonry, wire, household trash, photographic film scraps, plywood, car parts, piping and demolition debris. The volume of solid waste detected in the South Central Disposal Area test pits ranged from 2 c.y. to 15 c.y. in each test pit.
Thomas O'Connor of the DEP staff visited the site on December 1, 1997. At the time of this observation, he noted that the color of the soil in the Northwest Disposal Area appeared slightly less blue than it had been in 1991, but the area was still devoid of vegetation. Mr. O'Connor also observed that the amount of visible solid waste at several of the disposal areas of the site had decreased, but he was unable to determine if solid waste had actually been removed from the site or buried or relocated on the site.
Solid waste has the potential to pollute groundwater. Rain water coming into contact with solid waste dissolves the soluble components of the solid waste, releasing those components to the groundwater below. Organic matter present in solid waste alters the chemistry of the underlying groundwater, increasing the CT Page 6273 solubility of certain compounds in the soil such as iron, manganese and heavy metals. If the solid waste is buried, the solubility of these compounds increases. The process by which contaminants dissolve and enter the groundwater is known as leaching and groundwater containing such dissolved contaminants is known as leachate.
In their 1991 and 1992 inspections of the site, DEP staff observed a reddish yellow leachate, typically found around landfills, running through the inland wetlands and seeping into the man-made pond, and some leachate staining on the inlet to the pond. During the December 1, 1997 site visit, DEP staff observed similar leachate staining nearing the inlet to the man-made pond. Based on substantial evidence, the hearing officer concluded that the solid waste at the site polluted, and was reasonably likely to continue to pollute, the waters of the state and must be removed to a licensed disposal facility to eliminate a source of pollution to the waters of the state.
The existing site investigations do not fully reveal the character and extent of soil and groundwater pollution at the site.
The DEP, as of the date of the hearing, had an inventory of several thousand sites in Connecticut that required additional investigation and possible remediation.
In early 1993, DEP staff tried unsuccessfully to persuade a former owner, ADC to voluntarily remediate the site, but never took any formal enforcement action against ADC because of concerns about limited staff resources. In early 1996, after Cadle Properties of Connecticut, lnc. ("Cadle Properties"), the plaintiff's predecessor in title, obtained the site, DEP staff also tried to persuade Cadle Properties to voluntarily remediate the site. When those efforts proved unsuccessful, the Commissioner issued an order to Cadle Properties on February 7, 1997. Upon learning that Cadle Properties had transferred the site to the plaintiff, the Commissioner withdrew the order and issued the order which is the subject of these proceedings.
The DEP staff neither discussed voluntary remediation of any portion of the site with Benjamin Schilberg, nor did the Commissioner take formal enforcement action against Schilberg.
Benjamin Schilberg's son, Bernard Schilberg, has been the CT Page 6274 vice president of Schilberg Integrated Metals, the successor company to Schilberg Iron Metals, since approximately 1987. Bernard Schilberg has also been a member of the Underground Storage Tank Petroleum Clean-up Account Review Board ("the UST Board") since 1994, and in that role, has had contact with several DEP staff members, including the Chief of the DEP Waste Management Bureau. Elsie Patton and Thomas O'Connor were not aware of Bernard Schilberg's position with the UST Board prior to hearing his testimony in the hearing before the DEP hearing officer and had no contact with him during the period of time when the decision to issue the current order was made.
Ms. Patton testified that the DEP did not pursue an enforcement action against Benjamin Schilberg because his responsibility was limited to a portion of the site and issuing an order to both Schilberg and the site's owner would have resulted in delays in the hearing process and in the overall remediation of the site.
General Statutes § 22a-432 provides that if the DEP Commissioner "finds that any person has . . . created a condition . . . or is maintaining any . . . condition which reasonably can be expected to create a source of pollution to the waters of the state, he may issue an order to such person to take the necessary steps to correct such potential source of pollution." "Pollution," for purposes of § 22a-432, "means . . . the contamination or rendering unclear or impure or prejudicial to public health of any waters of the state by reason of any wastes or other material discharged or deposited therein. . . ." General Statutes § 22a-423. Section 22a-423 further defines "rendering unclear or impure" as "any alteration of the physical, chemical or biological properties of any of the waters of the state. . . ." General Statutes § 22a-423. The hearing officer, based on substantial evidence, found that the deposits of TPH, VOCs and heavy metals in the groundwaters of the site had altered the chemical properties of those waters and thus polluted them within the meaning of § 22a-432. The continuation of such pollution can be anticipated in view of the continuing presence of the contaminants in the soil of the site.
The solid waste on the surface and in the soils of the site also polluted the groundwaters of the state by altering the chemical properties and will continue to do so unless removed from the site. The solid waste presents a risk of pollution to the ponds on the site. CT Page 6275
In Starr v. Commissioner of Environmental Protection,226 Conn. 358, 382 (1993), the Supreme Court found that an owner of property is "maintaining" for purposes of § 22a-432 when the owner fails to abate pollution existing on their property that reasonably can be expected to create a source of pollution to the state's water regardless of their responsibility for the creation of the condition. The Starr case is dispositive of the legal obligation of this plaintiff owner with respect to the pollution on its property. General Statute § 22a-207(6) defines as a solid waste disposal area a location used for the disposal of more than ten cubic yards of solid waste. General Statutes § 22a-208a
requires the DEP Commissioner to issue a permit to establish a solid waste facility. Substantial evidence in the record establishes that no permit was issued for this particular site to operate as a solid waste facility. The plaintiff thus has an unpermitted solid waste facility on its property in violation of § 22a-208a. The DEP Commissioner is authorized to issue an order correcting or abating violations of § 22a-208a. See § 22a-225. The Commissioner's order required the owners to secure the site from vehicular entry, remove the solid waste from the site to an approved facility, investigate the extent and degree of soil, groundwater, and surface water pollution and based on the results of the investigation, propose and undertake remedial action to correct the pollution. Remedial orders of the DEP must bear reasonable relationship to the substantive violations which underly the order. Connecticut Building Wrecking Co. v.Carothers, 218 Conn. 580, 605 (1991). The lead and copper contamination in the soils of the Northwest Disposal Area pose a threat to human health from direct exposure. Securing the site from unauthorized entry minimizes the risk of direct human exposure and also prevents the disbursal of the contaminants and the depositing of other wastes at the site.
The solid waste at the site has polluted and is reasonably likely to pollute the groundwaters of the state. The removal of the solid waste is necessary to eliminate the source of pollution to the waters of the state. The DEP staff and Rizzo associates' testing confirms soil and groundwater contamination on the site. The testers have not completely examined the site and further testing is necessary to determine the full degree and extent of site contamination.
Remedial action is necessary in order to remove the existing pollutants from the waters of the state and to prevent the CT Page 6276 further pollution of waters of the state.
In this appeal, the plaintiff challenges the evidentiary basis of the decision; evidentiary rulings relating to the DEP's enforcement policy and a claim of selective prosecution.
At the outset, the court notes the "standard of review for all of the plaintiff's claims on appeal. Because [the court is] reviewing the decision of an administrative agency, [the court's] review is highly deferential. . . . Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law. . . ." (Citations omitted; internal quotation marks omitted.) Bezzini v. Dept. of Social Services,49 Conn. App. 432, 436 (1998).
The court's "review of an agency's factual determination is constrained by General Statutes § 4-183(j), which mandates that a court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . (5) clearly erroneous in view of the reliable, probate, and substantial evidence on the whole record. . . . This limited standard of review dictates that, with regard to questions of fact, it is neither the function of the trial court . . . to retry the case or to substitute its judgment for that of the administrative agency. . . . Anagency's factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole. . . . Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . This substantial evidence standard is CT Page 6277 highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . . The burden is on the plaintiff to demonstrate that the [agency's] factual conclusions were not supported by the weight of substantial evidence on the whole record. . . ." (Brackets omitted; citations omitted; internal quotation marks omitted.) New England Cable Television Assn., Inc. v. DPUC,247 Conn. 95, 117-18(1998).
The claim of selective prosecution imposes an extremely difficult burden on its proponent. Schnabel v. Tyler,230 Conn. 735, 762 (1994). The proponent must prove that (1) the person compared with others similarly situated was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. See LeClair v. Saunders,627 F.2d 606, 68-610(2d. Cir. 1980), cert. denied, 450 U.S. 959(1981). The plaintiff compares itself not to other similarly situated owners of property, but rather to other parties who participated in the pollution of the site. Such persons as non-owners would not be similarly situated. The plaintiff does not allege that the selective treatment was based on any impermissible considerations and have no basis of a claim of malicious or bad faith intent. The hearing officer was free to accept the testimony of Patton and O'Connor that they were unaware of the connection between the Schilbergs. The plaintiff's claim if it asserts bias by the DEP is not supported by evidence of the disqualifying interest. The party who contends that the decision is influenced by bias bears the burden of proving the disqualifying interest. See Jutkowitzv. Department of Health Services. 220 Conn. 86, 100 (1991);Petrowski v. Norwich Free Academy, 199 Conn. 231, 236, appeal dismissed, 479 U.S. 802 (1986); Clishman v. Board of PoliceCommissioners, 223 Conn. 354, 361 (1992).
The plaintiff's evidentiary claims relate to the evidence which would purportedly contradict the assertion that the parties responsible for the active pollution were not the subjects of the order to avoid a more complex hearing. The relevancy of such evidence is negligible in view of the limited impact. Whether the DEP could have or should have prosecuted other parties responsible for the pollution on the site; unquestionably, the Commissioner is authorized to pursue any party, like the plaintiff who maintains the site. Where the legislature has specifically empowered the Commissioner with such authority, it CT Page 6278 is inappropriate for the court to rewrite the statute to require a different process and result. This is especially the case after the Starr decision, which clearly establishes the owner's liability regardless of the property's history.
Accordingly, the final decision of the DEP is affirmed and the appeal is dismissed.
Robert F. McWeeny